**George Herman EMMETT**

v.

**Dr. James G. RICKETTS, Warden, Georgia Diagnostic & Classification Center, Jackson, Georgia.**

**James Edward CREAMER**

v.

**Joe S. HOPPER, Warden, Georgia State Prison.**

**Nos. C 74–831A, C 74–1112A.**

United States District Court, N. D. Georgia, Atlanta Division.

June 17, 1975.

J. Wayne Moulton, Decatur, Ga. (Moulton, Carriere, Cavan & Maloof, Decatur, Ga.), W. Benjamin Ballenger, Bobby Lee Cook, Summerville, Ga. (Cook & Palmour, Summerville, Ga.) for George Herman Emmett.

Hylton B. Dupree, Jr., Marietta (McDonald & Dupree, Marietta, Ga.), for James Edward Creamer.

John B. Ballard, Jr., Asst. Atty. Gen., State of Georgia, Atlanta, Ga., for respondents.

## ORDER

MOYE, District Judge.

These habeas corpus petitions arise out of the shocking and widely publicized slayings of two Marietta, Georgia, pathologists, Drs. Warren and Rozina Matthews, which occurred in the early morning hours of May 7, 1971. Despite what has been described as one of the most extensive investigations in the State's history, numerous aspects of the case remain shrouded in mystery The many tantalizing clues, the important leads that were never pursued,[1] the controversial prosecutions which resulted, all combined with the sensational nature of the crime to make the case, even to this day, the subject of intense me-

---

1. The number and significance of the investigative gaps in this case is truly astounding. Cobb County District Attorney Darden acknowledged during these hearings that the Matthews investigation had been "bungled."

dia coverage and general community interest.

Petitioners Emmett and Creamer were tried separately in early 1973 before the Superior Court of Cobb County under an indictment charging them and seven other alleged co-conspirators[2] with two counts of murder and two of felony murder. Creamer's conviction on all counts was affirmed by the Supreme Court of Georgia, *Creamer v. State,* 232 Ga. 136, 205 S.E.2d 240 (1974), as was Emmett's conviction on the felony murder charges. *Emmett v. State,* 232 Ga. 110, 205 S.E.2d 231 (1974).[3] These petitioners and all other alleged participants in the crime with the exception of Deborah Kidd have steadfastly protested their innocence.

Emmett and Creamer filed separate but similiar petitions that were consolidated for hearing at the request of the respondent wardens. Both charge that the state criminal proceedings to which they were subjected were honeycombed with constitutional error, and the allegations of prosecutorial bad faith and misconduct that have punctuated the Matthews murder prosecutions[4] are present here. The scope of the issues raised in the petitions together with the inherent complexity of the subject matter and the large volume of heretofore unrevealed evidence necessitated some 17 days of hearings in this Court. As a result of those hearings, the Court is drawn to the ineluctable conclusion that these convictions must be overturned.[5] The legal bases for granting habeas corpus in these cases will be discussed in succeeding pages. As a predicate to the Court's conclusions of law, however, a necessarily capsulized statement of the relevant facts is essential.

### The Facts

The instant convictions and those that followed were obtained almost entirely on the strength of testimony provided by Deborah Ann Kidd. The prosecution offered no physical evidence tending to link these petitioners or any of the alleged co-conspirators to the crime; their presence at the scene and their participation in the fateful events of May 7, 1971, were established solely by her testimony. Kidd, a self-admitted former habitual and prolific user of amphetamines,[6] prostitute, and shoplifter, provided testimony at the Emmett and Creamer trials that was in certain

2. Billy Richard Jenkins, Larry Hacker, Hoyt Powell and Wayne Ruff received convictions following their joint trial in July 1973. After a mistrial, Charles Benjamin Roberts was convicted in January of this year. Mary Ann Morphus received immunity in return for her testimony, and the remaining alleged co-conspirator, Carolyn Sue Bowling Johnson, was indicted but never tried.

3. Neither has sought to collaterally attack his conviction in the state courts.

4. Subsequent to the Emmett and Creamer convictions, Jenkins, Powell, Hacker, and Ruff instituted Civil Action No. 18518 in this Court seeking damages and injunctive relief against criminal prosecution for their alleged participation in the Matthews murders. The allegations of prosecutorial misconduct contained in that complaint are serious and multifarious, the most prominent being the contention that the testimony of the State's principal witness, Deborah Ann Kidd, had been manufactured through the use of hypnosis. In light of the Fifth Circuit's holding in *Shaw*

*v. Garrison,* 467 F.2d 113 (5th Cir. 1972), this Court commenced hearings on the plaintiffs' prayer for injunctive relief. The State sought to halt proceedings in this Court by means of an application for mandamus in the Court of Appeals. That tribunal stayed further proceedings at this level pending its inquiry into the State's petition, and in the interim, the challenged prosecutions went forword, thereby mooting the mandamus action and the injunctive aspects of Civil Action No. 18518. The claim for damages predicated on the alleged violations of those plaintiffs' civil rights is still pending.

5. Counsel for the respondents have seemingly conceded the inevitability of this result; they would prefer, however, that it be done at some later time by the Georgia state courts.

6. Kidd testified that she had been using amphetamines for two years prior to the murders and continued to do so until October 1973, consuming up to 50 and 75 "Black Beauty" capsules per day.

respects contradictory of the physical evidence and of testimony given by other witnesses. Nevertheless, her testimony, the highlights of which are summarized below, has been given credence by four separate juries and, prior to the instant habeas corpus proceedings, there was little or no indication that it had ever varied significantly.

A. *The Emmett and Creamer Trials— The Testimony of Deborah Ann Kidd*

Kidd testified at the trials of these petitioners that she met Creamer at a gambling club in Greenville, South Carolina on May 2, 1971.[7] She quickly became, in her words, Creamer's "old lady" and stayed with him until they departed by automobile for Georgia in the company of Hoyt Powell and Wayne Ruff on the morning of May 4. Upon arriving in Atlanta they checked into the Days Inn Motel on Interstate I-85, Creamer registering in the name of "C. A. Bloom."[8] She claims to have met petitioner Emmett, Charles Roberts, Larry Hacker and Foster Sellers[9] there on the same date.

In the days that followed, Kidd and Creamer visited various locations in the Atlanta area including the offices of an Atlanta attorney. It was there, Kidd contended, that the plan to rob the Matthews home was conceived.[10] On the night of May 6 they "all" had a party at the Days Inn which included the consumption of drugs and alcohol, and in the early morning hours of May 7[11] Kidd and others set out from the motel for the purpose of robbing the Matthews. Kidd rode in a white station wagon "with a girl named Sue"[12] and Larry Hacker. Creamer, Ruff and Powell departed in a blueish-gray car. Emmett, Roberts and Billy Richard Jenkins traveled in an unidentified automobile. All participants except Kidd and possibly "Sue" wore gloves.

Upon arriving at the scene, the males dispersed to various locations around the grounds, and immediately one of the garage doors began to open. Kidd saw Ruff hit Dr. Warren Matthews over the head with a tire tool as Matthews exited the garage in his blue Mercedes-Benz sports car. Ruff and Creamer dragged the doctor from his automobile out onto the driveway and shot him twice. As Kidd and "Sue" stood outside, petitioners Creamer and Emmett, Wayne Ruff, Hoyt Powell and Charles Roberts rushed into the lower part of the house through the garage door. A spate of gunshots was heard, and Emmett ran out to inform Kidd

---

7. At trial Creamer admitted knowing Kidd but insisted that he first met her sometime in mid-July of 1971.

8. The registration card was never located by police.

9. Foster Sellers was never charged in connection with the murders, but Mary Ann Morphus, whose only alleged involvement was to harbor Creamer at her home in Savannah after the murders, was charged with murder. Morphus originally told investigators that Creamer arrived in Savannah during the third week in May (thereby corroborating Creamer's story) but after receiving immunity she provided testimony corroborative of Kidd's version. Neither Morphus nor any other witness, however, testified to having seen Kidd in Savannah prior to July of 1971.

10. The failure to investigate that attorney's alleged connection with the crime is one of the several striking investigatory lapses that remain unexplained to date.

11. Subsequent to these convictions the defense obtained copies of two checks allegedly endorsed by Kidd in Greenville, South Carolina, on May 1971, and a notarized affidavit filed in connection with a divorce proceeding to which she was a party signed by her in Greenville on the same date. When confronted with this evidence Kidd at first denied that the signatures were hers. After three separate handwriting experts confirmed that the signatures found on those documents did belong to Kidd, she stated that the checks had been post-dated and endorsed by her sometime before May 7. She also maintained that the divorce affidavit was signed on a day other than that of the Matthews' murders.

12. Kidd originally positively identified the girl with whom she rode as Carolyn Sue Bowling Johnson. At the trials of these petitioners, however, she testified that she wasn't certain whether "Sue" and Johnson were the same person. See note 25, *infra*.

that Creamer had been shot, she was later to learn, by Mrs. Rozina Matthews.

Upon entering a utility room adjacent to the garage, Kidd saw Creamer, who had been shot by Mrs. Matthews with her .38 caliber Smith and Wesson revolver. Creamer was "scrunched up" on the floor, bleeding[13] from a wound in his side or lower chest. Mrs. Matthews, whose arms were covered with blood, stood on a stairway that led from the utility room to the upstairs part of the house. The door at the top of the stairs had locked behind her and a pistol lay at her feet. The female pathologist was confronted by Powell, Ruff, Roberts and Emmett, grabbed by her arms and pushed out a door to the patio.

Kidd sought refuge from the bloody scene, pulling herself up the aforementioned stairway by using a handrail. She gained access to the living quarters, enlisting the aid of Emmett who opened the locked door with burglar tools. From an upstairs window Kidd saw Ruff shove Mrs. Matthews to her knees on the patio. Ruff repeatedly struck her with his fists, and when she attempted to stand on several occasions, he dealt her heavy blows knocking her again to the patio. As Kidd watched, Charles Roberts sought her out upstairs and, grabbing her roughly by the arms, forced her to join the others in back of the house. When Kidd attempted to flee Ruff pursued her and threw an ax which stuck into a tree. She was carried back to the patio and was made to shoot Mrs. Mathews in the head with the victim's own gun.

After a hurried departure from the scene, Kidd and others (Roberts and Ruff left in Dr. Warren Matthews' car) took Creamer to the home of one B. J. Watkins ("Little B. J.") in Chamblee, Georgia, where Creamer was treated by a Doctor Cooley. Kidd and several others then returned to the scene of

the crime and conversed briefly with a woman bystander who was later identified as Judy Fox. Kidd, Creamer and others departed for Savannah Beach the same day where she remained while Creamer convalesced. She had no further involvement in the case until the Summer of 1972 when she related her original story to Donnie Gilreath.

## B. *The Early Investigation*

The pre-Kidd phase of the Matthews murder investigation began at approximately 6:30 a. m., on May 7, 1971, when the Cobb County Police Department received a phone call from a neighbor of the Matthews who had been awakened by gunshots and the screams of a woman. The neighbor was later to testify that when he looked out his window, from which he had a clear view of the Matthews' house and the wooded area behind it, he saw no people or automobiles.

About five minutes later representatives of the Cobb County Police Department arrived at the scene to find the body of Dr. Warren Matthews located in the driveway and that of Mrs. Matthews on the patio in the rear of the house. The subsequent investigation, conducted by Dr. Larry Howard, Director of the State Crime Laboratory, and several crime lab specialists, revealed certain findings that would prove highly relevant during later proceedings; among them were the following:

1. Warren Matthews had been shot in the chest and back. Rozina Matthews had been shot in each arm and in the back of the head.

2. Substantial quantities of blood were found in and about the garage of the Matthews' home. Numerous samples were taken, typed and identified. Only Types O and AB, the same types as the Matthews', were found at the scene. No Type A blood, like that of petitioner Creamer, was produced.

---

13. Kidd's original accounts of the murder had Creamer bleeding profusely from the gunshot wound. In succeeding versions and at the trials of these petitioners, Kidd stated that Creamer's blood loss was moderate to light.

3. Investigators recovered no weapons but retrieved numerous spent bullets from the crime scene. The ballistic characteristics of those bullets indicated that three different .38 caliber pistols were fired. Subsequent investigation revealed that petitioner Creamer had a bullet in his right side. When that bullet was surgically removed from his body, it was found to have been fired by a .38 caliber pistol other than a Smith and Wesson, the gun owned and allegedly used by Rozina Matthews on the day of the murders, and it did not match any of those found at the Matthews' home.[14]

4. An autopsy disclosed no bruises or cuts to indicate that Mrs. Matthews had been beaten, and none of her clothing or hosiery was torn.

5. There were fingernail abrasions under the right jaw of Dr. Warren Matthews, and his polished shoes showed no scuff marks of the kind that might be expected had he been dragged along the ground.

6. All physical evidence was collected and removed to the Georgia State Crime Laboratory. No ax or hatchet was found, nor was there any indication that one had been thrown and stuck into a tree.

7. Police found a bloody handprint and numerous fingerprints at the crime scene. All prints were highly identifiable, the handprint being described as excellent. None of these prints belonged to Kidd or to any of the parties who would later be indicted for the slayings.

8. No evidence of disturbance or blood was found in the upstairs part of the house.

The investigation immediately following the slayings revealed other information that was to be of great importance. Police officers who interviewed neighbors of the Matthews and other persons who were in the vicinity of the Matthews' home at the time of the slayings spoke with one man who reported that he had seen two shabbily dressed "teenagers" (a description fitting none of the indictees) driving a Mercedes sports car, like that of Dr. Warren Matthews, in the morning hours of May 7 near where the victim's automobile was actually found. Another observer reported seeing an automobile parked in front of the Matthews' house about the time the murders took place. His description of the two occupants did not match those of any of the subsequent indictees. The substance of these interviews was reduced to memorandum form and the memoranda placed in the police file. One Judy Fox told police of having spoken briefly with a young lady who stopped in front of the Matthews' home in the midmorning hours of May 7. On August 1, 1971, Janice Sue White and George Ledet told investigators that one Willie Lloyd Gauldin had confessed to them that he was the murderer of the Matthews couple. Gauldin was taken into custody and was later delivered to Edwin P. Hall, a licensed clinical psychologist, for hypnosis and questioning. Hall reported to the Cobb County authorities that Gauldin was not involved in the slayings and provided them with a transcript of Gauldin's hypnotic interrogation. The White and Ledet statements remained in the police files.

14. In a "confidential" affidavit submitted to the Court of Appeals in support of the State's petition for mandamus in Civil Action 18518, George Darden, then District Attorney for the Cobb Judicial Circuit, and Roy Barnes, an Assistant District Attorney, noted that a bullet had been found in Creamer's body in the location previously indicated by Kidd. Those affidavits neglected to mention, however, that the bullet had long since been retrieved from Creamer's body and that it matched none of the weapons known to have been fired at the scene of the crime. (Creamer testified at trial that he was shot in the back during an attempted armed robbery near the Atlanta airport around the 19th or 20th of May, 1971.) Former District Attorney Ben Smith testified that this development was the source of no small degree of consternation in the prosecutor's office.

## C. *Deborah Kidd—The First Contacts*

For nearly a year the investigation lay dormant, all leads having been "exhausted" by the Summer of 1972. Then, on July 26, 1972, Major Jesse Cooper, Superintendent of Detectives for the Cobb County Police Department, received a telephone call from Special Agent Donnie Gilreath of the South Carolina Law Enforcement Division (SCLED). The salient portions of the conversation between Gilreath and Cooper were summarized in a document entitled "Lead Information." Cooper was informed that an unidentified female informant (later learned to be Deborah Ann Kidd) had related to Gilreath a story concerning a double murder in the Atlanta Metropolitan Area. The informant was then in custody on a shoplifting charge and was asking immunity from Georgia authorities in exchange for her testimony. The informant's version of the crime, as reflected in the "Lead Information" report, contained the following details that conflicted with the known physical evidence and with the story Kidd was later to tell at trial:

1. The victims were awakened by the intruders, who were already in the upstairs part of the house. A gun battle ensued during which one of the burglars was wounded.

2. Both victims were bound, taken downstairs, and subsequently shot by the wounded burglar.

3. Several items were removed from the house including clothing, a weapon and items from a medical bag.

4. One of the participants was a Sue Johnson who lived in Ohio.

5. The incident occurred during cold weather; sometime around Christmas or New Years.

6. Kidd had been living with Creamer for about two months prior to the incident.

The petitioners were never provided a copy of this document.

That same day, Ben Smith, District Attorney for the Cobb Judicial Circuit, authorized and signed, apparently solely on the strength of the aforesaid telephone call, a blank grant of transactional immunity; the name of the recipient to be filled in upon delivery in South Carolina. Major Cooper then dispatched Detective Wayne Ellis of the Cobb County Police Department and Detective Roy Jones of the Georgia Bureau of Investigation (GBI) to deliver the grant of immunity and interview the informant.

Jones and Ellis met with Kidd, Gilreath and other SCLED agents in Columbia, South Carolina. Jones testified in these habeas corpus hearings that this initial interview was never tape recorded. Kidd and Gilreath testified that it was. Ellis stated that not only was the interview tape recorded, but that he and Jones replayed the tape during their return automobile trip to Cobb County. He also testified that Jones acknowledged having possession of the tape during proceedings in Civil Action No. 18518 in June 1973. Having observed the two agents testify, the Court is persuaded as to the truthfulness of this portion of Ellis' testimony. No such tape recording is now in existence according to the respondents.

The evidence is consistent that during this first interview Kidd was under the influence of drugs and gave a rambling, sketchy account of the murders. Jones stated that she told some "weird stuff" and that her story contained, in addition to some known facts, "a world of discrepancies." Agent Gilreath testified that Kidd omitted most of the subsequent indictees from her account, stated that Creamer bled profusely at the scene of the crime and said that clothes and jewelry were taken from the Matthews' home. Gilreath testified further that at a second interview in Columbia approximately three days later Kidd was left alone for periods of time with Matthews murder case

files the agents had brought from Georgia and was able thereafter to recall details of the murder scene that she was previously unable to remember. This testimony is disputed, but it is undisputed that during the initial interview as well as in a prepared statement later signed by her, Kidd never mentioned Larry Hacker as a participant in the crime.

Kidd's revelations during the two interviews were later summarized in a report compiled by Agent Jones dated August 19, 1972.[15] Most aspects of the narrative recorded therein are wholly inconsistent with the physical evidence and with Kidd's subsequent testimony. The sequence of events, the actions of all concerned and their locations at given times are at odds with any reasonable reconstruction of the crime. The Jones report contains myriad details and embellishments on the Kidd story that have never even been hinted at. Suffice it to say that this document is utterly devastating to Kidd's credibility. The prosecution had possession of the report but never furnished the defense a copy. When the existence of the document was discovered during these proceedings and a copy finally produced by the respondents, another GBI agent testified that the report is missing from that agency's files. Its absence is unexplained on the record.

Deborah Kidd was taken to Georgia on August 3, and police made an unsuccessful attempt to recover the alleged murder weapons[16] from a wooded area where Kidd indicated they had been buried. She was' taken back to South Carolina but returned to Georgia to stay later in August where, for roughly two weeks, she was quartered at the apartment of Detective Ellis with whom she had sexual relations and professed to be in love. During this time Kidd maintained her drug habit by use of amphetamines supplied by the police, and she continued her heavy drug use at least into October of that year. It was also during August that the first color photographs were taken of the Matthews' house. Shortly thereafter, Kidd led police to the Matthews' house, assertedly without their assistance and without having seen the photographs.

On August 9 Kidd signed a typewritten statement detailing her version of the crime. This statement, like the July 26 and August 19 reports, is replete with material discrepancies and allegations that were later dropped from her story. Once again, the prosecution had possession of the statement but never disclosed the fact of its existence, let alone its contents, to the defense.

The three versions related by Kidd to this time clearly indicated without equivocation that Carolyn Sue Bowling Johnson was present and participated in the slayings. As a result, the GBI and Cobb County officials began a follow-up investigation into Johnson's presence at the scene. The investigation revealed that on May 7, 1971, she was under the personal care of a Hamilton, Ohio, physician, Dr. Habib Nackla. Dr. Nackla's oral statement and his medical records confirm this. Johnson's alibi was

---

15. Respondents have argued that the particulars of this document as well as the August 9, 1972, statement by Kidd should not be disclosed to the petitioners at this time, but should be inspected by this Court *in camera* according to the procedure prescribed in *Williams v. Dutton,* 400 F.2d 797 (5th Cir. 1968), *cert. denied,* 393 U.S. 1105, 89 S.Ct. 908, 21 L.Ed.2d 799 (1969), *appeal. after remand, United States ex rel. Williams v. Dutton,* 431 F.2d 70 (5th Cir. 1970). While the Court is not enamored of this procedure, the contents of those documents have not been di-

rectly disclosed to counsel for the petitioners. The Court is aware however, that counsel may have obtained knowledge of the information contained therein through other sources or as a result of their own and the Court's examination of witnesses during the course of these proceedings.

16. Kidd later told police that she had given Mrs. Mathews' .38 caliber Smith and Wesson pistol to one Harry Wingate. Authorities made no serious effort to obtain the gun from Wingate.

clearly substantiated and Kidd's various statements clearly contradicted.

Conducted by GBI Agent Preston Purvis, the investigation did indicate that Johnson had participated in a criminal activity having many of the same characteristics and trappings of the crime described by Kidd. to wit: the wounding of one participant, Creamer, and the rendezvous at "Little B. J.'s" house thereafter. Johnson, however, said this occurred on or about May 21, 1971. There is uncontradicted evidence that Kidd, who, along with Ellis, accompanied Purvis to Ohio for the purpose of interviewing Johnson, adopted certain portions of Johnson's story and used it in her version of the Matthews' murders. It was only after the Ohio trip and Sue Johnson's return to Georgia, for instance, that the Days Inn Motel [17] was mentioned by Kidd as the point of departure of the Matthews murders.

### D. *Deborah Kidd and Hypnosis*

While in South Carolina, Kidd told investigators that she could not remember many details of the crime because she was "full of pills" during its commission. Not only did her story conflict with the known facts, "she didn't", according to Jesse Cooper, "remember important things at the scene she should have." This phenomenon was characterized as "partial amnesia" in "confidential" affidavits submitted to the Fifth Circuit Court of Appeals. It is a fair statement that by the end of August, Kidd's scenario, riddled as it was with inconsistencies, implausibilities and gaps, was in dire need of shoring up if the prosecution were to obtain convictions.

It appears that Jesse Cooper first suggested taking Kidd to a hypnotist. Al-though getting her off drugs is a professed purpose for that action, it is clear that the dominant, overriding, if not sole, motivation therefor was, in Cooper's words, to "further her memory" and to fill in "gaps" in her story. Kidd herself stated, and the Georgia Supreme Court found, that the purpose of these sessions was "to have Hall place her under hypnosis and by [age regression] help her remember more of the details of the crime which she could not remember because of the time lapse and her use of amphetamine type drugs." *Emmett v. State, supra,* 232 Ga. at 115, 205 S.E.2d at 235. Thus, on August 30, 1972, Deborah Kidd was carried to the office of Edwin P. Hall, an applied clinical psychologist [18] and practitioner of hypnosis. For his services Hall would ultimately receive some $3,515 in fees from Cobb County.

According to Hall, he met with Kidd on 12 occasions for a total of some 35 to 36 hours. He "talked with her at length about her involvement in the case" and allegedly assisted her in recalling details by means of a hypnotic process known as "age regression." Kidd, like Gaudlin before her, signed a waiver form asking that she be hypnotized and questioned with respect to the Matthews murders, and Hall acknowledges making no attempt to determine the extent or degree of her addiction to drugs. In early September of 1972 Kidd had begun to waver on the issue of Carolyn Sue Bowling Johnson's participation in the crime, and Johnson was then taken to Hall by police, ostensibly for the purpose of testing the verity of her version of the facts against that of Kidd.

Kidd later testified that as a result of her visits to Hall's office she was able to recall the events of May 7 with greater clarity,[19] and defense counsel have con-

---

17. Johnson initially told investigators that the participants in the crime described by her had left from a Holiday Inn. She later corrected herself when she and officers attempted to find it. A registration card located at the Days Inn tends to corroborate her story. See note 28, *infra.*

18. Contrary to assertions made in the aforesaid "confidential" affidavit submitted to the Court of Appeals, Hall is not a psychiatrist but a psychologist holding a doctorate degree in education from the University of Alabama.

19. For example, neither Larry Hacker's alleged participation in the crime nor Kidd's en-

sistently maintained that Kidd was programmed with known details of the crime during these hypnotic encounters. She did tell this Court that Hall instructed her to scan local newspapers and clip articles pertaining to the Matthews case.[20] And although Hall and Cobb County authorities alike have testified that he was given no information about the crime and was not supplied with police reports, evidence introduced in these hearings belies those assertions.[21]

During the Emmett trial Hall testified that 10 to 14 hours of the aforesaid sessions were tape recorded. He further testified under oath that the taped material related primarily to Kidd's participation in the Matthews murders. At the Emmett trial Hall also represented that he had with him *all* such tapes and transcripts that had been made from the tapes. Counsel for Emmett moved at that time that the *tapes* be taken into custody and inspected *in camera* pursuant to *Brady.* The trial court declined to do so, citing the psychologist-patient privilege, but took the alleged transcripts into custody. At subsequent hearings before this Court in Civil Action No. 18518, counsel for the prosecution stated that all of the Hall tapes remained intact. This Court at that time, prior to the stay by the Court of Appeals, directed counsel to take all steps necessary to insure that the tapes would be preserved inviolate.

In July of 1973, at the trial of Jenkins, Powell, Hacker and Ruff, and on similar motion, the same trial judge decided that an *in camera* inspection of certain tapes would be proper—those of two hypnotic sessions wherein Kidd was hypnotized and questioned in the presence of Major Cooper, members of the District Attorney's Office and GBI Agent Jones. Hall was directed by the court to go into

chambers and find the tapes of the above-noted interviews. Returning approximately an hour later, he told the court that he could not find any tapes of age regression or hypnosis and that those tapes had apparently been inadvertently destroyed. He did state, however, that he had located two transcripts of the sessions in question. The trial judge then allegedly made an *in camera* inspection of those transcripts and placed them in the registry of the court. He found no *Brady* [22] matter to be present.

During these habeas corpus proceedings Richard Moore, co-counsel for the respondents, produced the entire Hall file. He reported that this was the same file that was placed in the registry of the Cobb County Superior Court during the Emmett trial. While under cross-examination in this Court, Hall searched for the two transcripts noted above and was unable to locate them. He explained that they must have been either destroyed or removed from the registry of the court sometime between the July 1973 trial and the habeas corpus hearing.

### Brady Issues

#### A. The Hall Tapes, Notes and Memoranda

Preliminarily, the Court notes that all of the so-called Hall tapes and transcripts produced at these habeas corpus proceedings are of non-hypnotic, non-age regression sessions that took place in and around September of 1972. Heretofore, it had been represented that the bulk of the tapes contained age regression sessions wherein Kidd's memory was "reconstructed." Also before the Court are miscellaneous accounts of the murders and drawings of the scene penned by Deborah Kidd.

counter with Judy Fox was mentioned by Kidd until sometime after she began seeing Hall. In the existing tapes and transcripts of Hall's interviews with Kidd she specifically denies that Hacker participated in the crime.

20. On one of the tapes that remain in the Hall file he tells Kidd that she "ought to read that newspaper and get those names straight."

21. See note 26, *infra.*

22. *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963).

Edwin Hall, in his testimony before this Court, explained that the hypnotic and age regression tapes were possibly erased through re-use. By his explanation, the earliest tapes would have been the first recycled, but it is the tapes of later sessions, including specificially the hypnotic and age regression tapes made one day before the Creamer trial, that never surfaced. The Court finds specifically that Hall knew and appreciated the value of these tapes and further finds Hall's explanation of their destruction to be incredible.[23]

The unavoidable conclusion is that either there has been a deliberate destruction of vital and highly material evidence, or that no age regression or hypnosis ever took place. The former involves the unlawful obstruction of justice and the latter evidences perjury by an agent of the State. In any event, some or all of the hypnotic and age regression tapes were in existence and available at both trials or they never existed at all. This circumstance is of critical importance because the prosecution has never advanced any explanation of Kidd's dramatic "restoration" of memory, a restoration that included the abandonment of multitudinous inconsistent and impossible aspects of her original story, other than through hypnotic "age regression."

■ The trial court denied the defense access to the Hall materials and refused to inspect them *in camera* holding them to be privileged under Ga. Code Ann. § 84–3118. This Court finds that no such privilege ever existed. *See Collins v. Howard,* 156 F.Supp. 322 (S. D.Ga.1957). Kidd was taken to Hall for the same purpose as were Lloyd Gauldin and Carolyn Sue Bowling Johnson: to further the investigation of the Matthews murder case. The "improvement" of Kidd's memory was the result

desired, and in performing this service Hall acted as a paid agent of the state, indeed, as an investigative arm of the prosecution. The details of the alleged confidential communications were, by Kidd's testimony, related by her to Ben Smith following most of the "therapeutic" sessions. Hall also testified that he disclosed some of Kidd's revelations concerning other unrelated crimes to an FBI agent and, as previously mentioned, police and prosecutors were permitted to listen to an alleged age regression session on the day before the Creamer trial. It is clear to this Court that the therapeutic services rendered by Hall, if any, were merely incidental to his investigative mission and that the claim of privilege constitutes nothing more than a sham and a facade. Counsel for the respondents have acknowledged the correctness of this Court's findings on the privilege issue and, as will be discussed more fully below, the trial court has since reversed its stance on the question.

The Georgia Supreme Court's analysis of the *Brady* issue proceeded as follows; (1) the Hall materials consist only of tape recordings made during periods of hypnosis, (2) statements made while the declarant is in a hypnotic trance are inadmissible, (3) evidence that would be inadmissible at trial need not be produced pursuant to *Brady,* (4) consequently, the trial court did not err in denying the defense access to those materials or in refusing to inspect them *in camera.*

■ Ordinarily, of course, a state court's ruling on admissibility of evidence does not present cognizable habeas corpus issues. See *Buchannon v. Wainwright,* 474 F.2d 1006 (5th Cir. 1973), and cases cited therein at 1007. But such rulings are not binding on federal courts when they affect the adjudication of substantial federal constitutional

---

23. During the course of these proceedings some rather lurid evidence, the substance of which need not be repeated here, was introduced bearing negatively upon the credibility and professional conduct of this witness. The Court has further observed his demeanor and considered his responses to questions during his many hours of testimony in this case. The Court does not credit his testimony as to the matters here involved.

claims. *Henry v. Mississippi*, 379 U.S. 443, 85 S.Ct. 564, 13 L.Ed.2d 408 (1965); *Gibson v. Blair*, 467 F.2d 842 (5th Cir. 1972). Assuming arguendo the validity of the Supreme Court's assumption regarding the contents of the Hall file, this Court perceives serious Sixth and Fourteenth Amendment confrontation and due process problems in the position espoused in the *Creamer* and *Emmett* opinions. Moreover, this Court has never considered admissibility to be a factor under *Brady*.[24] These issues remain academic, however, in light of the fact than no tapes or transcripts of alleged hypnotic sessions are to be found in the Hall file.

Subsequent to the appeal and affirmance of the Emmett and Creamer convictions and after these habeas corpus hearings had commenced, the trial court issued and forwarded to this Court a copy of an order styled *"State of Georgia v. James Edward Creamer, Charles Benjamin Boberts, et al."* The order, dated November 25, 1974, recited that the trial judge had inspected the files of Edwin Hall and had verified the validity of the existing transcripts by playing the tapes. The following findings were made:

"1. Substantially, the tapes relate to Debra Kidd's association with those alleged to be accomplices and other confederates of accomplices to the extent that the greater portion of the conversations relates to other matters than the slayings of the Doctors Matthews.

"2. There was no implanting of any facts by Dr. Hall by hypnosis, suggestion or prompting of any facts, but his activity was solely passive except to 'withdraw' further information from Debra Kidd based upon some declarations by Debra Kidd.

"3. I find no conflict between the testimony of Debra Kidd on the several trials as set forth on either the tapes or transcripts.

"4. There is contained no facts or information impeaching in nature of the testimony of Debra Kidd given on prior trials.

"5. I find and conclude that the State has not withheld any facts or information tending to establish the innocence of any defendant nor impeaching the testimony of Debra Kidd on prior trials.

"6. I find that the State has not purposefully withheld any information beneficial to the defendants nor destroying any contentions made by the State."

At the time the aforesaid order was issued, the Hall file remained in the custody of the Cobb Superior Court. It was subsequently produced at these proceedings and was used for impeachment purposes. Exposure of its contents opened a prosecutorial Pandora's box.

At the outset it should be mentioned that not all portions of the existing tapes have been transcribed. Those that have not contain some of the material most damaging to the State. The Kidd drawings, written materials and oral statements contain inconsistencies and implausibilities too numerous to detail. The tapes and transcripts contain a blithe admission by Kidd that she lied about Carolyn Sue Bowling Johnson's participation in the crime[25] followed by her

---

24. In this district *Brady* has been held to require disclosure of names and addresses of persons known to the government to have information about the accused or the facts of his case. *United States v. Eley*, 335 F.Supp. 353 (N.D.Ga.1972). Similarly, the United States Court of Appeals for the District of Columbia Circuit has interpreted *Brady* to preclude governmental suppression of the means of obtaining evidence or of leads to relevant evidence. *United States v. Bowles*, 159 U.S.App.D.C. 407, 488 F.2d 1307 (1973), *cert. denied*, 415 U.S. 991, 94 S.Ct. 1591, 39 L.Ed.2d 888

(1974). *See also Giles v. Maryland*, 386 U.S. 66, 98, 87 S.Ct. 793, 809, 17 L.Ed.2d 737 (1966), Fortas, J., concurring: "I do not agree that the State may be excused from its duty to disclose material facts known to it prior to trial solely because of a conclusion that they would not be admissible at trial."

25. Hall: "Well, I thought Sue had been with you."
Kidd: "No, uh uh, I must of lied or something. She wasn't with us in the murder. I brought her name up. I had her in

later insistence that Johnson was there. In them Kidd admits that she is "treacherous" and asks Wayne Ellis many questions. Moreover, she unequivocally states that Larry Hacker had no involvement in the crime. These materials also reveal Hall extending to Johnson the stick of continued imprisonment and the carrot of immunity and release from jail in an attempt to induce her to change her story to conform to Kidd's.[26] The tapes are further voluminously laced with comments and statements by Hall that may fairly be characterized as suggestions for improvement of Kidd's scenario.[27]

█ It is a fundamental tenet of constitutional law that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Brady v. Maryland, supra,* 373 U.S. at 87, 83 S.Ct. at 1196. And "[w]hen the 'reliability of a given witness may well be determinative of guilt or innocence,' nondisclosure of evidence affecting credibility falls within this general rule." *Giglio v. United States,* 405 U.S. 150, 154, 92 S.Ct. 763, 766, 31 L.Ed.2d 104 (1972). Furthermore, the standard of materiality that the nondisclosed evidence must satisfy in order to warrant a new trial is relaxed in cases where the suppression is found to be deliberate or where the substantial value of the evidence to the defense could not have escaped the prosecutor's attention. *Ross v. Texas,* 474 F.2d 1150 (5th Cir. 1973), *reh. denied,* 472 F.2d 1405, *cert. denied,* 414 U.S. 850, 94 S.Ct. 141, 38 L.Ed.2d 98 (1973); *United States v. Keogh,* 391 F.2d 138 (2d Cir. 1968).

The materiality of the contents of the Hall file is not subject to question. The respondents do not contend, nor could

---

my mind because I'm jealous of her, I guess really. She was at B. J.'s asleep. And when . . . ."

Hall: "Now, Debbie . . . which is it?"

Kidd: "She was at B. J.'s asleep. That's the truth."

Hall: "That's not what you told me before."

Kidd: "I lied before . . . I did."

Hall: "Why?"

Kidd: "Because of him."

Hall: "Who?"

Kidd: "Because they keep . . . I told you, they keep pressuring me and they keep telling me that Sue was there—her handprints or something—and I just give up; and I told him—I finally told them I was lying, and he asked me why. You know what I told him—I said cause you wanted her there."

Hall: "Well, you know, I don't want anybody anywhere."

26. Hall: "Now, let me finish. Listen to the whole thing. Now, I know that you don't want to be locked up and if I were you involved in the same that Debbie is and you see Debbie out and you see you locked up, I wouldn't be too happy about that either. But what I'm telling you is that if you will cooperate . . . ."

Johnson: "But . . . ."

Hall: "Wait a minute, just listen to me . . . and tell the whole absolute truth, they will give you immunity, the same way they've done Debbie.

Johnson: "But I can't tell no more than I know and I've already told them what I know."

Hall: "Well, if that's the case then undoubtedly what's going to happen because they don't consider it to be helpful to them whether or not you implicate yourself or anybody else about the Matthews case, there is enough other information to keep you locked up regardless. On the other hand if you have not told the whole truth and do tell the truth about the Matthews case, they will give you immunity and you'll be able to get out."

Johnson: "I can tell them no more than I know. I don't know nothing about it."

Hall: "Well it's going to be unfortunate in a way that you don't *because* even if you don't *whether it's the truth or not and you don't tell it, you're going to stay locked up.* (Emphasis supplied)

Police and prosecution representations to the contrary notwithstanding, other portions of the colloquy between Johnson and Hall demonstrate that Hall was given access to police investigation reports.

27. Former District Attorney Ben Smith admitted that Hall's statements indicated knowledge that could only have been acquired through access to police investigation files, and that they constituted suggestions to Kidd as to what the true facts of the case were.

they, that the tapes, transcripts and other written materials would have been of no use to the defense. Kidd's importance to the prosecution's case cannot be gainsaid—she was the prosecution's entire case. Her credibility was the pivotal issue in these cases, and the Hall materials were absolutely essential to a fair appraisal of the credibility of the State's critical witness. One can only speculate as to the contents of those tapes that have been deliberately destroyed. The clear presumption is that they would not have reflected favorably on Hall, Kidd or the prosecution.

In *United States v. Eley, supra,* at 358, Judge (now Chief Judge) Edenfield of this Court stated:

"It should also be pointed out that the Brady duty affects not only the office of the United States Attorney in Atlanta, but also any other investigative agencies of the Government which have gathered information as part of the case of the prosecution against the accused who seeks disclosure."

A decision in the same vein from the United States Court of Appeals for the District of. Columbia Circuit is *United States v. Bryant,* 142 U.S.App.D.C. 132, 439 F.2d 642 (1971). And in *United States v. Deutsch,* 475 F.2d 55 (5th Cir. 1973), the Fifth Circuit Court of Appeals held that the Department of Justice and the Post Office Department are not severable entities for purposes of production under *Brady.*

The following passage from *Barbee v. Warden, Maryland Penitentiary,* 331 F.2d 842, 846 (4th Cir. 1964), is particularly apropos:

"Nor is the effect of the nondisclosure neutralized because the prosecuting attorney was not shown to have had knowledge of the exculpatory evidence. Failure of the police to reveal such material evidence in their possession is equally harmful to a defendant whether the information is purposely, or negligently, withheld. And it makes no difference if the withholding is by officials other than the prosecutor. The police are also part of the prosecution, and the taint on the trial is no less if they, rather than the State's Attorney, were guilty of the nondisclosure. If the police allow the State's Attorney to produce evidence pointing to guilt without informing him of other evidence in their possession which contradicts this inference, state officers are practicing deception not only on the State's Attorney but on the court and the defendant. 'The cruelest lies are often told in silence.' If the police silence as to the existence of the reports resulted from negligence rather than guile, the deception is no less damaging.

"The duty to disclose is that of the state, which ordinarily acts through the prosecuting attorney; but if he too is the victim of police suppression of the material information, the state's failure is not on that account excused. We cannot condone the attempt to connect the defendant with the crime by questionable inferences which might be refuted by undisclosed and unproduced documents then in the hands of the police. To borrow a phrase from Chief Judge Biggs, this procedure passes 'beyond the line of tolerable imperfection and falls into the field of fundamental unfairness."

See also *Nash v. Purdy,* 283 F.Supp. 837 (S.D.Fla.1968); *Evans v. Kropp,* 254 F.Supp. 218 (E.D.Mich.1966).

■ This Court has already held Hall to be an investigative arm of the prosecution. His work with Gauldin and Johnson had no therapeutic pretense, and the Kidd sessions, as noted above, were a thinly veiled effort to prop up the prosecution's case. Hall was as much a member of the prosecutorial team as any of the police officers investigating the murders. In fact, it appears that the services performed by him were more instrumental in obtaining the petitioners' convictions than those performed by any single member

of the police, GBI or District Attorney's Office. The State's assertion that Hall refused to relinquish his file to prosecutors avails it nothing. Both the District Attorney's Office and Hall were duty-bound under *Brady* to produce the entire Hall file. The trial court erred in refusing to compel its production, in declining to inspect the materials *in camera* and in failing thereupon to make them available to the defense.

### B. *Other Investigative Reports, Statements and Memoranda*

During the Fall of 1972, the period in which Deborah Kidd was under the "treatment" of Edwin Hall, the District Attorney for Cobb County was Ben Smith. Smith had previously announced his intention to relinquish that office at the expiration of his term, and George "Buddy" Darden, one of Smith's assistants, became engaged in a closely contested campaign for his boss's job.

Both Smith and Darden disavow any close connection with Kidd or the investigative aspects of the case throughout the Fall of 1972. Darden's campaign literature, however, noted the fact that he had been assigned to try the Matthews cases, and Deborah Kidd has testified that she gave regular accounts to Smith regarding her sessions with Hall. In any event, Kidd is reputed to have made impressive "progress" during this period, and that fact was well known to the prosecution.

It was also in October or early November of 1972 that Detective Wayne Ellis and GBI Lt. Preston Purvis were removed from the Matthews investigation. Those officers, particularly the latter, had discovered evidence tending to corroborate the story told by Carolyn Sue Bowling Johnson and to discredit Kidd.[28] Each had expressed doubts concerning Kidd's story and the prosecu-

tion's theory of the case. No explanation for the removal of Ellis and Purvis has been offered by the State.

The Court observes that during the months of September, October and November Kidd's "recollection" became closer to the testimony she would eventually give at the Emmett and Creamer trials. The evidence clearly shows that she "remembered" more and frequently different facts about the crime after the alleged hypnosis and age regression. The Court also finds that as the prosecution's theory of this case ripened with the "restoration" of Kidd's memory, there was a decision made in the Office of the Cobb County District Attorney to suppress all evidence of Kidd's prior inconsistent statements. The prosecution's handling of the hypnosis issue, the firing of Ellis and Purvis and the subsequent response to these petitioners' *Brady* motions were to that end. The result was the total suppression of nearly all evidence concerning Kidd's pre-Hall accounts of the crime.

■ Both petitioners made "blunderbuss" pretrial *Brady* motions for the production of investigative reports records, tapes, accounts and other documents. The prosecution, though it knew full well the exculpatory and devastating nature of the documents it possessed, did not divulge their existence or contents to either petitioner. It instead turned its files, allegedly containing the July 26 "Lead Information" memorandum, the prepared statement signed by Kidd on August 9 and the August 19 Jones report, over to the trial judge without giving him a hint or clue as to their existence or significance. This, like the prosecution's ploy of padding its witness list with 500 names[29] was an act calculated to

---

**28.** It was Purvis who unearthed a doctor's report indicating that Johnson had been in Hamilton, Ohio, on the day of the murders. Purvis also uncovered hospital records in Savannah showing that Creamer had been treated there on May 22 of 1971 and a Days

Inn registration card in the name of Neville Oden (a Ruff alias) dated May 12, 1971.

**29.** That witness list, which the State is required by law to provide to defense counsel, did not even contain Deborah Kidd's name.

obfuscate rather than to clarify, and it is not surprising that the trial judge failed to select the crucial documents for defense perusal.

■ In this Court's opinion, the prosecutorial duty to produce exculpatory evidence imposed by *Brady* may not be discharged by "dumping" (even in good faith) a voluminous mass of files, tapes and documentary evidence on a trial judge. There are indeed established procedures for *in camera* inspections of materials where, for example, the State has a bona fide interest in protecting the confidentiality of some matters contained therein or where the prosecutor entertains genuine doubt as to whether a particular item is subject to production under *Brady. See United States v. Quinn,* 364 F.Supp. 432 (N.D. Ga.1973); *United States v. Houston,* 339 F.Supp. 762 (N.D.Ga.1972); *United States v. Eley, supra.* But the prosecutor retains the constitutional obligation of initially screening the materials before him and handing over to the defense those items to which the defense is unquestionably entitled under *Brady.* Furthermore, an *in camera* procedure must involve the opportunity for the tribunal conducting the inspection to be made aware of possible implications of the documents examined. The relevance and materiality of some documents may not be apparent on the surface. For this reason, and because the trial judge might not be fully apprised of the anticipated issues to be tried, the prosecution has the affirmative duty of spelling out possible areas of materiality. Without this background, whether provided by the prosecution or by factual hearings in collateral proceedings, an *in camera* inspection will often be meaningless.

■ The State's assertion that petitioners could have learned the substance of Kidd's original version through interviews with witnesses does not excuse the prosecution's dereliction in this case. There is no contention that the petitioners actually knew of the suppressed documents or that they had any idea of the exculpatory testimony those witnesses might provide. Moreover, the Court specifically rejects any contention that counsel for the petitioners failed to exercise due diligence with respect to this matter. The State may not defend its wrongful suppression of vital information on the grounds that defense counsel could by luck or intuition have hit upon the existence of the suppressed materials. See *Jackson v. Wainwright,* 390 F.2d 288 (5th Cir. 1968); *United States v. Poole,* 379 F.2d 645 (7th Cir. 1967); *Levin v. Katzenbach,* 124 U.S.App.D.C. 158, 363 F.2d 287 (1966); *Barbee v. Warden, Maryland Penitentiary, supra; Nash v. Purdy, supra; Evans v. Kropp, supra.*

■ The highly material and exculpatory nature of the three documents mentioned above has already been noted. Kidd's explanation that her original version of the murder was a product of her mentally homogenizing it with numerous other crimes in which she participated does not affect the materiality of the suppressed documents.[30] Clearly, they were vital to the defense of these cases and should have been produced. During these proceedings the Court directly inquired of counsel for the respondents whether they had the slightest doubt that these documents should have been produced prior to trial. Counsel were unable in good faith to express such a doubt. Their only reply was that it was not their function to pass upon actions of the trial judge. This constituted a concession of these *Brady* issues.[31]

---

30. Indeed the rationalization only points up the critical need for the defense to have available to it such materials to aid in cross-examination to determine if the witness did in fact correctly unscramble her memory.

31. The Court notes that at the subsequent trial of Charles Benjamin Roberts the trial court ordered that the July 26 "Lead Information" memorandum be given to the defense, an implied admission of its previous error.

### C. Exhaustion and Intentional Bypass Issues

In defense of this habeas corpus action the respondents contend that Emmett and Creamer have failed to exhaust state remedies presently available to them and that the petitioners deliberately bypassed state procedures. The exhaustion argument has two components: (1) "a petitioner may not present both exhausted and unexhausted issues" on habeas corpus and (2) a petitioner may not present an issue "which has a counterpart in State appeal but has not been the subject of a state evidentiary, collateral proceeding" for the kind of factual development sought here.

With respect to (1) above, the respondents have alluded to their pre-hearing motion to dismiss that was based on the petitioners' presentation of the unexhausted contention that the State had unlawfully concealed promises of immunity made to a witness, Larry Wade Truett. In its brief supporting that motion the State argued that Emmett and Creamer should be made to elect either to pursue their non-exhausted claim in state court or to waive and abandon it, proceeding on federal habeas corpus solely on those issues that had previously been exhausted. The Court agreed, and both petitioners promptly jettisoned the unexhausted claim.

■■■■ If the thrust of respondents' argument in their post-trial brief be that the Court erred in following the foregoing procedure that argument is without merit. As observed in this Court's interlocutory orders of August 21, 1974, while the Court of Appeals has repeatedly expressed its disapproval of "piecemeal" presentations of habeas claims, *see Harris v. Estelle*, 487 F.2d

1293 (5th Cir. 1974), and cases cited therein at 988, it has sanctioned a number of variant responses to situations in which both exhausted and unexhausted issues are presented on habeas corpus. Of particular pertinence to the instant case is the decision of *Redd v. Louisiana*, 489 F.2d 766, 767 (5th Cir. 1973), in which it was held that the petitioner "must be accorded the alternative of electing to proceed further in the [federal district] court below solely on the claims he has previously exhausted." The unexhausted, abandoned claim in question is not so intertwined with the remaining issues as to render consideration of the latter inappropriate, and it pales before the array of serious, exhausted constitutional issues presented in this case. Under these circumstances, the *Redd* procedure advocated by the respondents and followed by this Court was appropriate.

■■■■ Considerations of comity undergird the exhaustion doctrine, and interposition of exhaustion as a defense in habeas corpus actions does not speak to the district court's jurisdiction but to the proper exercise of federal power. *E.g., Fay v. Noia*, 372 U.S. 391, 83 S.Ct. 822, 9 L.Ed.2d 837 (1963); *Darr v. Burford*, 339 U.S. 200, 70 S.Ct. 587, 94 L.Ed. 761 (1950); *Hairston v. Alabama*, 465 F.2d 675 (5th Cir. 1972).[32] The doctrine requires that, absent extraordinary circumstances, state courts be given the initial opportunity to consider and correct constitutional violations resulting from state criminal prosecutions. *Picard v. Connor*, 404 U.S. 270, 92 S.Ct. 509, 30 L.Ed.2d 438 (1971). The "ultimate question for disposition"[33] need not be presented to the state courts more than once. If the highest court in the state system has been afforded one full chance on appeal to correct the

---

32. Consequently, a state may waive lack of exhaustion as a defense to habeas corpus. *West v. Louisiana*, 478 F.2d 1026 (5th Cir. 1973), *aff'd en banc*, 510 F.2d 363 (5th Cir. 1975). *Goins v. Allgood*, 391 F.2d 692 (5th Cir. 1968); *McGarrah v. Dutton*, 381 F.2d 161 (5th Cir. 1967).

33. This formulation, taken from *United States ex rel. Kemp v. Pate*, 359 F.2d 749, 751 (7th Cir. 1966), appears to be the generally accepted standard by which exhaustion issues are judged. See *Picard v. Connor, supra*, 404 U.S. at 277, 92 S.Ct. 509.

alleged constitutional error the petitioner will not be required to pursue state collateral remedies. *Brown v. Allen,* 344 U.S. 443, 73 S.Ct. 397, 97 L.Ed. 469 (1953). Presentation in this fashion will accomplish exhaustion regardless of whether the highest state court actually decides the issue on the merits. *E.g., Bishop v. Wainwright,* 511 F.2d 664, 665–66 n. 2 (5th Cir. 1975); *United States ex rel. Geisler v. Walters,* 510 F.2d 887 (3d Cir. 1975); *United States ex rel. Leeson v. Damon,* 496 F.2d 718 (2d Cir. 1974).

▮ Both of these petitioners made comprehensive pretrial *Brady* motions that unquestionably covered all materials in the Hall file as well as the documents previously discussed. They were not required to request the production of specific documents and materials, particularly those of which they had no knowledge; the requests to produce filed in these cases served to avail the petitioners of the principles proclaimed in *Brady. See Shuler v. Wainwright,* 491 F.2d 1213, 1222 (5th Cir. 1974). On appeal, counsel for the petitioners requested the clerk to transmit the entire record to the Georgia Supreme Court. They assumed, mistakenly the State now asserts, that the Hall materials and the prosecution files were transmitted pursuant to that request and were before the Supreme Court when the appellate decisions were rendered. The State has also informed this Court that certain parts of the record, including an index of evidence previously submitted to the United State Court of Appeals for the Fifth Circuit in Civil Action No. 18501, were never sent to the Supreme Court because, apparently pursuant to the express directions of the trial judge, they were stored in a separate locked area of the Clerk's Office to which only the trial judge had access.

▮ Although the petitioners moved with alacrity to preserve their *Brady* rights at the trial level, they were unaware that the Hall file contained suppressed matter other than the tapes and transcripts, and they, of course, were precluded from learning the contents of the confidential affidavits and of the index of evidence submitted to the Court of Appeals with respect to Civil Action No. 18518 in this Court. As a consequence, their entitlement to specific materials other than the Hall tapes could not be argued by them on appeal. The State obviously made no mention of them. Petitioners' only recourse was to aver generally that the State had suppressed evidence [34] and to have the record sent up on appeal. In view of *Williams v. Dutton, supra,* they would be entitled to presume that any *Brady* material would be inspected *in camera* on appeal. The Supreme Court was aware of the procedure followed at the trial level and made the following findings at page 137 of the *Creamer* opinion, 205 S.E.2d at page 241: "The record in this case shows that the trial court did conduct an *in camera* inspection of the file of the district attorney and did reveal to the defense all exculpatory matter contained therein." Regardless of whether the Supreme Court actually inspected those files or whether the vital materials were present in the files at any time, the petitioners, through their counsel, did everything reasonably necessary, complying with all statutory rules and rules of court, to raise the issue (their entitlement to *all Brady* material) both at the trial and appellate levels. Exhaustion of those issues was thereby accomplished by the negative decision of the Georgia Supreme Court.

▮ Similarly, the asserted physical absence of the Hall tapes and transcripts before the Supreme Court did not pre-

---

34. In addition to raising on appeal specific *Brady* issues such as the trial court's handling of the Hall tapes and transcripts, both petitioners, in their enumerations of error to the Georgia Supreme Court, averred that "[t]he State willfully concealed and suppressed vital evidence, materially helpful to the defense, and of an exculpatory nature, prior to and during the trial of this case."

clude exhaustion of state remedies with respect to them. The Supreme Court made certain factual assumptions regarding the contents of the tapes and transcripts. As with the prosecution files, that court could have ordered the Hall files produced for its inspection. The fact that it apparently did not do so is of no consequence here; the "ultimate question for disposition," the *Brady* issue, was fairly presented on appeal to the Georgia Supreme Court which had full opportunity and authority to deal with the very matter now before this Court.

The respondents have objected to the scope of the hearings conducted in this Court and cite *Picard v. Connor, supra,* for the proposition that "when additional evidence is presented in a federal habeas hearing, which might affect the way in which state courts would consider the claim, the proper procedure is to direct that the factual inquiry be made by responsible state courts." Examination of that opinion, however reveals that the petitioner in *Picard* presented a different *issue* on habeas from that raised in the state courts. Such is not the case here. Emmett and Creamer presented to the Georgia state courts a multitude of constitutional issues ranging from violations of *Brady v. Maryland* and prosecutorial trial tactics to the alleged fabrication of testimony through the use of hypnosis. The state courts made findings of fact and conclusions of law with respect to those issues.

■■ Clearly, this Court on habeas corpus is not bound by the findings made at the state level; indeed, as *Townsend v. Sain,* 372 U.S. 293, 312, 83 S.Ct. 745, 756, 9 L.Ed.2d 770 (1963), makes clear:

"It is the typical, not the rare, case in which constitutional claims turn upon the resolution of contested factual issues. Thus a narrow view

of the hearing power would totally subvert Congress' specific aim in passing the Act of February 5, 1867, of affording state prisoners a forum in the federal trial courts for the determination of claims of detention in violation of the Constitution. The language of Congress, the history of the writ, the decisions of this Court, all make clear that the power of inquiry on federal habeas corpus is plenary. Therefore, where an applicant for a writ of habeas corpus alleges facts which, if proved, would entitle him to relief, the federal court to which the application is made has the power to receive evidence and try the facts anew."

It is readily apparent that many findings of material fact expressly and implictly [35] made at the state level in this case are not supported by the actual record. The material facts with respect to the *Brady* issues (as well as subsidiary questions such as privilege) and the use of suggestion (by hypnosis or otherwise) to bolster the testimony of the State's prime witness were not adequately developed or reliably determined. See 28 U.S.C. § 2254(d). This circumstance resulted in part from the prosecution's deliberate suppression of evidence and from the state courts' erroneous application of legal principles to the petitioners' claims. In situations of this kind, and where a petitioner has been denied in state court the opportunity to present evidence in support of a substantial constitutional claim, it is proper for a district court to receive evidence on habeas corpus.[36] *Gibson v. Blair,* 467 F.2d 842 (5th Cir. 1972). *See also Townsend v. Sain, supra,* 372 U.S. at 317, 83 S.Ct. 745.

■■ It is further obvious that resort to state habeas corpus in this case would have been an exercise in futility. The *Emmett* and *Creamer* opinions

---

35. See *Townsend v. Sain, supra,* at 314, 83 S.Ct. 745.

36. Adequate assessment of the materiality of asserted *Brady* material may necessitate thorough factual development on habeas corpus. See page 593, *supra.*

effectively precluded examination of the Hall materials and probably the prosecution files in the state system. And, even subsequent to this Court's ruling that the Hall file should have been inspected *in camera,* the trial judge's order of November 25, 1974, would in all likelihood, have stifled any independent examination of those materials by a state habeas court. The procedure advocated by the respondents would require these and other petitioners to shuttle back and forth between state and federal court in an effort to obtain complete rulings on constitutional claims. While the practice might accomplish exhaustion of the petitioners before the admittedly deserved relief was obtained, it would yield no dividends in terms of federal-state comity or the efficient administration of justice.

One final observation on exhaustion is in order. Counsel for the respondents do not and cannot deny that the petitioners' constitutional rights have been plainly and grossly violated.[37] Yet, they ask that federal relief be withheld in order that these nonissues may be presented to the state courts. There is no interest state or federal which justifies or requires the burdening of the state's judicial calendar with issues "predetermined by established federal principles." See *Roberts v. LaVallee,* 389 U.S. 40, 43, 88 S.Ct. 194, 19 L.Ed. 2d 41 (1967). Such a procedure, which would constitute a "hollow exercise in etiquette" and accomplish nothing except further delay in the vindication of the petitioners' federal rights, is not mandated by the exhaustion doctrine. *United States, ex rel. Cole v. Follette,* 301 F.Supp. 1137 (S.D.N.Y.1969), *aff'd,* 421 F.2d 952 (2d Cir. 1970). *See also Darr v. Burford,* 339 U.S. 200, 219, 70 S.Ct. 587, 94 L.Ed. 761 (1950); *Thomas v. Cunningham,* 335 F.2d 67 (4th Cir. 1964).

The State argues that the petitioners intentionally bypassed state procedures by failing to tender the testimony of Donnie Gilreath. Gilreath testified in these proceedings that he first spoke with counsel for petitioner Emmett subsequent to the convictions at a time when motions for new trials were pending in these cases. Although Gilreath's testimony was not offered in support of those motions, counsel for Emmett stated that it was tendered to the Georgia Supreme Court during oral argument.

Gilreath's testimony during these habeas corpus proceedings was of a cumulative nature. The most damaging evidence from the State's point of view came from the testimony of its own agents and from the Hall file. While the Court does not feel that the matters alleged constitute, even in a technical sense, a deliberate bypass as defined in *Fay v. Noia, supra,* certainly the most damaging consequence that might flow therefrom would be the exclusion of Gilreath's testimony on habeas corpus; a result that would have no impact on the issues presented here. Although the State's contentions in this regard are unclear, it has cited no authority, and the Court knows of none, that would command forfeiture of the ultimate issues on habeas corpus due to an asserted failure to offer the cumulative testimony of one witness.

### Conclusion

The issues treated above are but a few of the many advanced in support of the instant habeas corpus petitions. In turning this case on the *Brady* questions, the Court does not intend to imply that the constitutional claims left undecided today are insubstantial. But the *Brady* violations that taint these state murder convictions are so patently obvious and of such staggering magnitude as to render unnecessary consideration of the remaining issues.

In retrospect it is astonishing how little the petitioners, despite dili-

---

37. Instead, the Court understands the State's defense to be that the petitioners waived their rights or that they are not entitled to seek redress in this forum.

gent efforts, were able to learn about their accuser. The prosecutorial suppression of nearly all evidence concerning Deborah Kidd resulted in a criminal proceeding that bordered on the Kafkaesque, and it is this aspect of the case that the Court finds most disturbing. The hasty grant of immunity to Kidd before the extent of her participation in the crime was ever known, the extreme measures to which the state resorted in extracting information from (or more accurately, in supplying information to) this witness and the use of her testimony at trial,[38] the failure to pursue important leads in the case, the suppression of documents, the firing of police officers skeptical of Kidd's story, all raise grave questions regarding the single-minded zeal with which these convictions appear to have been sought and obtained. The predictable result is that this Court has before it a pair of criminal convictions obtained in a manner so manifestly and fundamentally unfair that they must be vacated. It is also obvious that, as a result of such prosecutorial suppression, and perhaps even destruction of vitally relevant evidence, the state may encounter serious constitutional problems if it wishes to retry petitioners.[39]

Accordingly, the Court directs the respondents, or whosoever may have pres-

---

**38.** See *Shaw v. Garrison, supra*, at 117.

**39.** If the State elects to retry the petitioners, they must, of course, be given the opportunity to file such pretrial motions to dismiss or otherwise as they consider appropriate. The Court observes that serious issues remain with respect to Deborah Kidd's competency to testify and the possibility of retrial when *Brady* material has been deliberately or even inadvertently destroyed by the State or its agents. See *Davis v. Pitchess*, 388 .F.Supp. 105 (C.D.Cal.1974). Any criminal proceedings must be commenced early enough in order that all pretrial issues the petitioners properly may raise will be fully aired and resolved and both trials, if any, be commenced within the period set by the Court.

**40.** During these proceedings counsel for respondents tendered to the Court *in camera* and under seal a file of certain documents alleged to be transcripts of interviews conducted

ent custody of the petitioners, to discharge the petitioners from custody insofar as they are held as a consequence of their convictions under Indictment No. 5019, unless the State elects to retry them and does retry them within 120 days of this order.[40] Given the history of these cases the Court deems it appropriate to retain jurisdiction over this matter until it is given final repose in order to insure that the commands of the United States Constitution are observed.

with Deborah Kidd in California between March 1974 and April of this year by prosecuting agents in that state to where the Cobb County prosecution sent Kidd (and with which California prosecuting agents the witness had the same kind of illicit relationship she earlier had with detective Ellis). Those transcripts have remained sealed, and the Court will return same to counsel for the respondents, unopened, for such disposition as counsel consider legally and ethically appropriate in light of the contents.

The Court should note, however, that respondents' counsel have represented to this Court that the sealed materials contain admissions by the witness directly contrary to her sworn testimony at petitioners' trials—admissions that would go a long way toward demonstrating that the witness did not, in fact, completely "unscramble" her memory before testifying at those proceedings.