**PUBLISHED**

**UNITED STATES COURT OF APPEALS**

**FOR THE FOURTH CIRCUIT**

LESLY JEAN,
<u>Plaintiff-Appellant,</u>

v.

DELMA COLLINS, Chief of Detectives
of the City of Jacksonville,

Individually; JAMES SHINGLETON,
Police Officer with the City of
Jacksonville, North Carolina, Police
Department, Individually,
<u>Defendants-Appellees.</u>

No. 95-7694

Appeal from the United States District Court
for the Eastern District of North Carolina, at Greenville.
Malcolm J. Howard, District Judge.
(CA-94-62-4-H2)

Argued: December 2, 1997

Decided: September 17, 1998

Before WILKINSON, Chief Judge, and WIDENER,
MURNAGHAN, ERVIN, WILKINS, NIEMEYER,
HAMILTON, LUTTIG, WILLIAMS, MICHAEL, and
MOTZ, Circuit Judges.

_____

Affirmed by published opinion. Chief Judge Wilkinson wrote the
majority opinion, in which Judges Widener, Wilkins, Niemeyer, Lut-
tig, and Williams joined. Judge Murnaghan wrote a dissenting opin-
ion. Judge Ervin wrote a dissenting opinion, in which Judges
Murnaghan, Hamilton, Michael, and Motz joined. Judge Hamilton
wrote a dissenting opinion, in which Judge Murnaghan joined.

**COUNSEL**

**ARGUED:** Richard Brooks Glazier, BEAVER, HOLT, RICHARD-SON, STERNLICHT, BURGE & GLAZIER, P.A., Fayetteville, North Carolina, for Appellant. Kenneth Ray Wooten, WARD & SMITH, P.A., New Bern, North Carolina, for Appellees. **ON BRIEF:** Rebecca J. Britton, BEAVER, HOLT, RICHARDSON, STERN-LICHT, BURGE & GLAZIER, P.A., Fayetteville, North Carolina, for Appellant. John R. Green, Jr., WARD & SMITH, P.A., New Bern, North Carolina, for Appellees.

_____

**OPINION**

WILKINSON, Chief Judge:

We granted en banc review in this case to determine whether the district court properly dismissed Lesly Jean's section 1983 claim against Jacksonville, North Carolina police officers Delma Collins and James Shingleton. The complaint alleged their failure to disclose exculpatory evidence during Jean's criminal trial for rape and first degree sexual offenses. The district court granted summary judgment in favor of Collins and Shingleton, holding they were entitled to qualified immunity. To the extent Jean claims the officers failed to disclose evidence directly to defense counsel, we hold that the officers are entitled to absolute immunity. To the extent Jean contends Collins and Shingleton failed to turn over evidence to the prosecutor, the officers are protected by qualified immunity. We thus affirm the judgment of the district court.

I.

On July 21, 1982, at approximately 3:00 a.m., a stranger entered the house and bedroom of Alice Kathleen Wilson and forcibly raped her. Soon after the incident was reported to the Jacksonville police, the department announced the suspect's physical description -- black male wearing a blue shirt, blue shorts, and white tennis shoes -- to its officers via radio transmission. At approximately 4:40 a.m., Officer James Shingleton spotted a man walking along a local highway

2

who matched the basic description from the radio dispatch. Shingleton activated the blue lights on his patrol car, exited the vehicle, and stopped the person. Shingleton questioned him, instructed him to place his hands on the fender of the car, and told him he was a suspect in a rape. At that point, the suspect fled into the adjacent woods; the encounter lasted approximately one minute and a half. Later that morning, Shingleton described the person he confronted as black, five feet ten inches tall, weighing 170 pounds, with close-cut hair and a mustache, and wearing blue shorts, a blue shirt with writing, white knee-high socks, and white tennis high-tops.

Meanwhile, Wilson was transported to the hospital for treatment and then to the police station to make a statement. She described her attacker as a black male, muscular, five feet eight inches tall, weighing about 165 or 170 pounds, with a marine haircut, kinky hair, no facial hair, and wearing dark shorts that were probably navy blue, white crew socks, and high-top sneakers. Wilson also met with a sketch artist to produce a composite of the suspect. A photograph of her composite was distributed to the Jacksonville Police Department. Afterwards, the same sketch artist also met with Shingleton but was unable to develop a reliable composite due to the incomplete nature of the officer's observations.

The following day, July 22, 1982, Detective Steve Smith, the lead investigator on the case, asked Captain Delma Collins to hypnotize Shingleton in order to garner further details about the person he stopped the morning of the crime. The hypnotic session was recorded on audio tape and its results were noted in a hypnosis information worksheet. Shingleton's memory of the possible suspect changed in at least three respects: he now believed that the tee shirt design was instead a sweat mark, he remembered that the person in fact did not have a mustache, and he recalled blue stripes on each of the person's socks. Detective Smith recorded in his notes: "As a result, his description matches the one given by victim."

On July 26, 1982, Chief of Police Roger Halbert was in a Dunkin Donuts and noticed appellant Jean, a marine stationed at Camp Lejeune in Jacksonville. Halbert believed Jean matched the composite of the suspected rapist. Halbert radioed the police department and asked that Shingleton be sent to the restaurant. When he arrived,

3

Shingleton identified Jean as the man he had seen on the morning of the rape and accordingly arrested him. Detective Smith then interviewed Jean and, after receiving his consent, searched Jean's locker and laundry bag at the marine base. Smith seized a pair of white high-top tennis shoes, dark blue athletic shorts with white stripes, and a blue tee shirt. Jean was fingerprinted, photographed, and then released.

The following day, July 27, 1982, Smith asked Wilson to come to the police station to view a photo lineup that included Jean's photo. After viewing the lineup, Wilson was unable to make a positive identification. The next day, Wilson called Smith at the police station requesting to look at the photos again because one of them had made her feel sick. After observing the photos a second time, Wilson picked out Jean's photo as the one that made her sick and stated that another of the photos looked "haunty." Again, however, she could not make a positive identification.

On July 30, 1982, upon the recommendation of Detective Smith, Captain Collins hypnotized Wilson in an effort to determine whether she could remember anything more about the photo that made her feel sick. Wilson's prehypnotic memories were recorded on a prehypnosis information worksheet, the session was recorded on audio tape, and new information was noted on another worksheet. At least three new pieces of information emerged during the session: Wilson believed her attacker had an accent, possibly Puerto Rican, and she recalled white shoelaces and a Nike emblem in connection with the attacker's shoes. Collins and Smith deemed the session to be unproductive due to the paucity of new details.

In the following two months, Wilson was asked to listen to voice identification recordings and view a live lineup. On August 4, 1982, after listening to several voice exemplars numerous times, Wilson stated that Jean's voice sounded like the one from her bedroom. Although Smith initially assumed she did not make a positive identification that day, Wilson later called him and explained that her statement was intended as a positive identification. She then confirmed again that Jean's voice exemplar was the voice of the man who had raped her. On September 17, 1982, Wilson was asked to view a live lineup consisting of three persons, including Jean. Wilson identified

4

Jean as the person who had raped her and the police placed him under arrest.

Jean was indicted in October 1982 for rape and first degree sexual offenses. Despite timely discovery requests, the prosecutor did not disclose the fact that witnesses had been hypnotized until Wilson's testimony at trial. The prosecutor also did not disclose the recordings of the hypnotic sessions, despite general pretrial discovery requests and a more specific request for such recordings by defense attorneys at trial. The jury, however, was made aware of Wilson and Shingleton's hypnoses, as defense counsel cross-examined both witnesses on that point.

On December 5, 1982, Jean was convicted on all counts and sentenced to two consecutive life terms. After his direct appeals and applications for state postconviction relief proved unsuccessful, Jean filed a petition for a writ of habeas corpus in the United States District Court for the Eastern District of North Carolina. In Jean v. Rice, 945 F.2d 82 (4th Cir. 1991) (per curiam), we reversed that court's denial of his petition, holding that the government's failure to disclose the audio recordings and the accompanying reports of the hypnotic sessions was a violation of the principles announced in Brady v. Maryland, 373 U.S. 83 (1963). Accordingly, we vacated Jean's conviction. The state declined to retry Jean, and he was released from prison.

On May 20, 1994, Jean filed the present complaint against Collins and Shingleton in the United States District Court for the Eastern District of North Carolina, alleging Fourth Amendment and Fourteenth Amendment Due Process Clause violations under 42 U.S.C. § 1983 and supplementary state-law claims. The district court dismissed Jean's state causes of action, holding that one failed to state a claim and that the others were barred by the applicable statute of limitations. In a later order, the district court granted summary judgment in favor of Collins and Shingleton on Jean's section 1983 claims, holding the police officers were protected by qualified immunity. Jean appealed the district court's summary judgment order only with respect to his due process claim. A panel of this court reversed the decision of the district court. Jean v. Collins, 107 F.3d 1111 (4th Cir. 1997). Thereaf-

5

ter, a majority of the judges in active service voted to rehear this appeal en banc.

II.

Initially we note that Jean's due process claim, alleging suppression of exculpatory evidence, does not clearly state the precise theory upon which it is premised. See Burns v. Reed, 500 U.S. 478, 487 (1991) (in cases implicating official immunity "it is important to determine the precise claim that petitioner has made"). At times, Jean contends his constitutional rights were violated as a result of Collins and Shingleton's failure to turn over evidence to the District Attorney's Office. At other times, however, Jean asserts that the officers generally suppressed the relevant evidence. See Compl. ¶ 41. (referring to "the actions of defendants in withholding exculpatory evidence"). Both Collins and Shingleton clearly understood Jean's complaint to allege their failure to disclose evidence directly to Jean's defense counsel. See Collins Aff. ¶ 20 ("At no time did I intentionally withhold this evidence from Mr. Jean's defense counsel."); Shingleton Aff. ¶ 21 ("At no time in my career as a police officer have I been trained that I am responsible for deciding what evidence will be presented at trial or disclosed to a criminal defense counsel in response to legal discovery requests."). To the extent Jean asserts a duty on the part of Collins and Shingleton to turn over exculpatory evidence to the defense, that claim must fail. Police officers are absolutely immune from suits challenging a failure to disclose evidence directly to the defense.[1]

The doctrine of absolute immunity under section 1983 rests on the

_____

[1] In his dissenting opinion, Judge Ervin claims we are precluded from considering the absolute immunity of Collins and Shingleton because it was not pled or addressed in prior proceedings. The officers did plead the defense of qualified immunity, however, and we may properly consider the closely related question of the scope of the immunity to which they are entitled. See Allen v. Zurich Ins. Co., 667 F.2d 1162, 1168 n.5 (4th Cir. 1982). Failure to do so here would create the possibility that qualified immunity would incorrectly be accepted as the limit of protection for police officers "performing functions that require the exercise of prosecutorial discretion." Kalina v. Fletcher, 118 S. Ct. 502, 507 (1997).

6

assumption that Congress did not intend to abolish certain well-established immunities recognized by courts at the time of section 1983's enactment. Buckley v. Fitzsimmons, 509 U.S. 259, 268 (1993). To evaluate government officials' specific claims for absolute immunity, the Supreme Court has adopted a functional approach -- inquiring whether the particular official performs functions similar to those protected by common-law immunities when Congress enacted section 1983. Id. at 268-69; Burns, 500 U.S. at 484, 486; Imbler v. Pachtman, 424 U.S. 409, 430 (1976). The Court recently reaffirmed this functional approach in Kalina v. Fletcher, 118 S. Ct. 502, 510 (1997), holding that a prosecutor personally attesting to the truth of facts necessary for a probable cause determination was not absolutely immune from suit because she functioned not in a prosecutorial role, but as a witness. The Court reiterated that "in determining immunity, we examine `the nature of the function performed, not the identity of the actor who performed it.'" Id. at 508 (quoting Forrester v. White, 484 U.S. 219, 229 (1988)); see Buckley, 509 U.S. at 269; Malley v. Briggs, 475 U.S. 335, 342 (1986); Carter v. Burch, 34 F.3d 257, 261-62 (4th Cir. 1994); see also Ireland v. Tunis, 113 F.3d 1435, 1443 (6th Cir.), cert. denied, 118 S. Ct. 560 (1997); Hill v. City of New York, 45 F.3d 653, 660 (2d Cir. 1995).

In Fletcher the Court explained that, to protect the independent judgment of prosecutors, an official is absolutely immune from suit when "performing functions that require the exercise of prosecutorial discretion." 118 S. Ct. at 507. The decision whether to disclose exculpatory evidence to an adversary is a central part of the prosecutor's trial preparation, is undertaken in the role of advocate for the State, and plainly requires the exercise of prosecutorial discretion. Imbler itself involved the prosecution's alleged suppression of material evidence at trial. 424 U.S. at 413-16. And subsequent decisions have left no doubt that prosecutors enjoy absolute immunity from claims alleging a failure to disclose exculpatory evidence. For example, the Court in Fletcher described Imbler as providing an absolute immunity defense to the prosecutor from Imbler's "charge that exculpatory evidence had been suppressed." Fletcher, 118 S. Ct. at 506. And in Burns, the Court explained that its Imbler decision, pursuant to the functional approach, held the prosecutor absolutely immune from suit for the "deliberate suppression of exculpatory evidence." Burns, 500 U.S. at 486. The Court has also stated that actions for which a prose-

7

cutor is accorded absolute immunity "must include the professional evaluation of the evidence assembled by the police and appropriate preparation for its presentation at trial or before a grand jury after a decision to seek an indictment has been made." Buckley, 509 U.S. at 273; see Ireland, 113 F.3d at 1445.

We have likewise read Imbler to require absolute immunity from section 1983 claims alleging suppression of exculpatory evidence. In Carter, we held that "the decision as to whether the evidence was exculpatory and should have been given to defense counsel . . . was clearly intended by Imbler to be the type of prosecutorial function for which absolute immunity should be granted." 34 F.3d at 262; see also Lyles v. Sparks, 79 F.3d 372, 377 (4th Cir. 1996) ("The Supreme Court also held in Imbler that absolute immunity protected the prosecutor from allegations that he had knowingly used perjured testimony and suppressed material evidence at the plaintiff's trial."). We explained in Carter that the decision whether to disclose evidence to the defense "is clearly part of the presentation of the State's case" and represented conduct undertaken as an advocate for the State. 34 F.3d at 262-63. Other circuits have reached the same conclusion. See Moore v. Valder, 65 F.3d 189, 194 (D.C. Cir. 1995), cert. denied, 117 S. Ct. 75 (1996); Reid v. New Hampshire, 56 F.3d 332, 336 (1st Cir. 1995) ("under Imbler it is now [a] well-settled rule that a prosecutor cannot be held personally liable for the knowing suppression of exculpatory information" (internal quotation marks and citation omitted)); Hill, 45 F.3d at 661-62; Myers v. Morris, 810 F.2d 1437, 1446 (8th Cir. 1987).

To the extent, therefore, that Jean contends that Collins and Shingleton failed to disclose exculpatory evidence directly to the defense, the police officers are entitled to the same absolute immunity that would be available to prosecutors for execution of the identical function. Jean's claim casts the officers in a role much different from their traditional investigatory one. Police officers normally assemble available evidence for the prosecution rather than evaluate it for trial purposes. Buckley, 509 U.S. at 273. Prosecutors assess the material and exculpatory nature of that evidence in determining whether disclosure to the defense is required. By asserting that the police have a duty to make such sensitive legal determinations, Jean raises a claim against the officers not in their investigatory role, but instead in an

8

advocate's role "intimately associated with the judicial phase of the criminal process." Imbler, 424 U.S. at 430. Under the Court's approach, the officers must be accorded absolute immunity.

The fact that the defendants in the present suit are police officers, rather than prosecutors, is irrelevant to the immunity analysis. Because the immunity is tied to the nature of the function performed and not to the identity of the defendant performing that function, e.g., Fletcher, 118 S. Ct. at 508, we look to the conduct challenged by Jean's suit rather than the defendants' titular position. The Court has specifically recognized that "[w]hen the functions of prosecutors and detectives are the same, as they were here, the immunity that protects them is also the same." Buckley, 509 U.S. at 276; see also Hill, 45 F.3d at 660 (extending absolute immunity to non-attorney employees of district attorney's office under functional approach); Davis v. Grusemeyer, 996 F.2d 617, 631 (3d Cir. 1993) (extending absolute immunity to employee working for attorney "when the employee's function is closely allied to the judicial process"). It would be incongruous to hold prosecutors absolutely immune from suits concerning disclosure decisions made in the course of their traditional advocate's role while granting police officers only qualified immunity with respect to the same decisions, which fall outside their normal investigatory role.

We note finally that the same considerations underlying absolute immunity for prosecutors also support granting police officers absolute immunity from suits alleging failure to disclose exculpatory evidence to the defense. The Court in Imbler first relied upon the common-law concern that "harassment by unfounded litigation would cause a deflection of the prosecutor's energies from his public duties." 424 U.S. at 423. The Court noted that "[s]uch suits could be expected with some frequency, for a defendant often will transform his resentment at being prosecuted into the ascription of improper and malicious actions to the State's advocate." Id. at 425. The same consideration countenances absolute immunity for the police officers in the present action. Because police uncover most evidence in criminal investigations, suits alleging suppression of exculpatory evidence could be leveled against them in almost every case. Imbler's observation that "a prosecutor inevitably makes many decisions that could engender colorable claims of constitutional deprivation," id., would

9

be no less true of police officers forced to make the difficult determinations surrounding the State's disclosure obligations. Without absolute immunity from section 1983 claims like Jean's, the police would be forced to defend against vexatious litigation and their "energy and attention would be diverted from the pressing duty of enforcing the criminal law." Id.

The Court in Imbler also relied upon the common-law concern that the fear of civil liability would create "the possibility that [a prosecutor] would shade his decisions instead of exercising the independence of judgment required by his public trust." Id. at 423. It is unlikely that police officers, who lack prosecutors' legal training, would be more able to confidently reach independent legal conclusions regarding the State's disclosure obligations without fear of civil liability. In fact, officers fearing personal liability would likely turn over much more evidence than necessary, thereby transforming the combination of section 1983 and Brady obligations into more absolute rights to discovery for criminal defendants. This would fundamentally change our adversarial system and harm the judicial process."The Brady rule is based on the requirement of due process. Its purpose is not to displace the adversary system as the primary means by which truth is uncovered, but to ensure that a miscarriage of justice does not occur." United States v. Bagley, 473 U.S. 667, 675 (1985). Granting police officers absolute immunity from suits alleging a failure to disclose accords with the considerations traditionally cited in favor of absolute prosecutorial immunity -- preservation of government officials' independent judgment, Imbler, 424 U.S. at 423, and the more general protection of the judicial process. Burns, 500 U.S. at 485.

Finally, we note that an adequate remedy for police officers' failure to disclose exculpatory evidence already exists in the criminal law. Whenever the State withholds material exculpatory evidence from the defense, the Constitution requires that any conviction gained thereby be vacated. Bagley, 473 U.S. at 678; Giglio v. United States, 405 U.S. 150, 155 (1972); Brady, 373 U.S. 83. The adequacy of judicial remedies for prosecutorial misjudgments "`tend[s] to reduce the need for private damages actions as a means of controlling unconstitutional conduct.'" Burns, 500 U.S. at 492 (quoting Butz v. Economou, 438 U.S. 478, 512 (1978)); Imbler, 424 U.S. at 427; Springmen v. Williams, 122 F.3d 211, 214 (4th Cir. 1997).

10

In sum, we find that absolute immunity for police officers performing prosecutorial functions is mandated by well-settled doctrine of the Supreme Court. We decline to make police officers into mini-prosecutors and to impose upon them obligations that would cut actual prosecutors out of the loop. From any claim that Collins and Shingleton failed to disclose exculpatory evidence directly to the defense, the officers are absolutely immune from suit.

III.

Jean next asserts that the officers had a constitutional duty under Brady to turn over evidence to the prosecution relating to Wilson's and Shingleton's hypnoses. Regardless of whether Jean's claim presently states a constitutional violation, we conclude that Shingleton and Collins are entitled to qualified immunity. In 1982, a reasonable police officer would not have known that his failure to turn over such evidence violated a criminal defendant's clearly established constitutional rights.

A.

The basic purposes of qualified immunity are well known. The immunity is designed to shield government officials performing their duties from the burdens of trial and the threat of monetary liability. Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982). "Without such an immunity, the operations of government would be immobilized." Torchinsky v. Siwinski, 942 F.2d 257, 260 (4th Cir. 1991). Government officials would not perform their discretionary duties vigorously but would act timidly to avoid the risk of being haled into federal court. Anderson v. Creighton, 483 U.S. 635, 638 (1987); Harlow, 457 U.S. at 814. Society also would bear substantial costs including "the expenses of litigation, the diversion of official energy from pressing public issues, and the deterrence of able citizens from acceptance of public office." Harlow, 457 U.S. at 814; see also Anderson, 483 U.S. at 638; Tarantino v. Baker, 825 F.2d 772, 774 (4th Cir. 1987). To limit these costs, qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law." Malley, 475 U.S. at 341. Thus, government officials forfeit this defense only where a reasonable official would have known that an action violated

11

clearly established constitutional rights. <u>Harlow</u>, 457 U.S. at 818; <u>Winfield v. Bass</u>, 106 F.3d 525, 530 (4th Cir. 1997) (en banc).

The requirement that a right be clearly established ensures that officials have ample notice of the legal standards that govern their conduct. <u>See Davis v. Scherer</u>, 468 U.S. 183, 195 (1984). Consistent with this need for notice, a court must identify the right infringed at a high level of particularity. <u>Anderson</u>, 483 U.S. at 639; <u>Winfield</u>, 106 F.3d at 531. To define the right too abstractly would convert the defense of qualified immunity "into a rule of virtually unqualified liability." <u>Anderson</u>, 483 U.S. at 639; <u>see also DiMeglio v. Haines</u>, 45 F.3d 790, 803-04 (4th Cir. 1995). Of course <u>Anderson</u> does not require that a prior case have held identical conduct to be unlawful. <u>Id.</u> at 640. But officers cannot be ambushed by newly invented theories of liability or by unforeseen applications of old ones. Thus,"the `contours of the right' must have been so conclusively drawn as to leave no doubt that the challenged action was unconstitutional." <u>Swanson v. Powers</u>, 937 F.2d 965, 969 (4th Cir. 1991) (quoting <u>Anderson</u>, 483 U.S. at 640); <u>see also Lassiter v. Alabama A & M Univ.</u>, 28 F.3d 1146, 1150 (11th Cir. 1994) (en banc) ("For qualified immunity to be surrendered, pre-existing law must dictate, that is, truly compel (not just suggest or allow or raise a question about), the conclusion for every like-situated, reasonable government agent that what[the] defendant is doing violates federal law <u>in the circumstances</u> .").

In order for notice to officials to be effective, the source of that notice must be identified. It is clear that a court cannot confine its assessment of an immunity defense to Supreme Court decisions alone. <u>See United States v. Lanier</u>, 117 S. Ct. 1219, 1226 (1997). It is equally clear that a court cannot restrict its inquiry to cases identified by the parties. <u>Elder v. Holloway</u>, 510 U.S. 510, 515 (1994). But government officials must have some guideposts about the sources of law that can clearly establish a particular right. Our nation's courts produce a vast number of decisions that could conceivably influence officials' discharge of their duties. <u>See Swanson</u> , 937 F.2d at 968. Officials cannot be expected to master the entire corpus of this caselaw in addition to fulfilling their public responsibilities. <u>See Davis</u>, 468 U.S. at 196 & n.13. The very immensity of American jurisprudence creates the distinct likelihood that jurisdictions will offer conflicting opinions over how government officials should carry

12

out their tasks. See Swanson, 937 F.2d at 968. To hold officials responsible for sorting out these conflicts, without any guidance about what jurisprudence to follow, could generate widespread confusion over the scope of official obligations. An unbounded legal universe would give rise to guessing games over whether this or that decision in this or that jurisdiction created a clearly established right. Such a limitless universe would also give judges broad latitude to second-guess the actions of officers on the spot.

Ordinarily, therefore, courts in this circuit need not look beyond the decisions of the Supreme Court, this court of appeals, and the highest court of the state in which the case arose to determine whether a right was clearly established at a particular time. Wilson v. Layne, 141 F.3d 111, 114 (4th Cir. 1998) (en banc); Wallace v. King, 626 F.2d 1157, 1161 (4th Cir. 1980). This presumption, like the Eleventh Circuit's longstanding practice, provides necessary guidance to government officials about whether a contemplated course of conduct may subject them to personal liability. See Jenkins by Hall v. Talladega Bd. of Educ., 115 F.3d 821, 826 n.4 (11th Cir.) (en banc), cert. denied, 118 S. Ct. 412 (1997); Hamilton by and through Hamilton v. Cannon, 80 F.3d 1525, 1531 n.7 (11th Cir. 1996); Courson v. McMillian, 939 F.2d 1479, 1497-98 (11th Cir. 1991). Thus, if a right is recognized in some other circuit, but not in this one, an official will ordinarily retain the immunity defense. Of course, the converse also holds true. If a right is clearly established in this circuit but not in another circuit, that conflict will not shield the official from liability. The approach we adopt will place parameters upon the immunity inquiry -- if immunity is to stem litigation, as the Supreme Court intended, the issue of whether a right is clearly established should not send public officials on an Odyssean quest.

B.

In this case, we must analyze the state of the law in 1982 to determine whether Collins and Shingleton violated a clearly established constitutional right. Anderson requires that the right be defined at a high level of particularity. But even at the highest level of generality, the right which Jean asserts was not clearly established in 1982. Jean has failed to demonstrate that, at that time, police had a duty grounded in federal law to turn over the evidence at issue to a prosecutor.

13

Several of the cases on which Jean relies do not even discuss whether police officers had any constitutional duty to provide evidence to a prosecutor. As of 1982, the Supreme Court had not held that police had such a constitutional duty; Brady and its progeny instead involved prosecutors' failures to disclose evidence to the defense. E.g., United States v. Agurs , 427 U.S. 97, 107 (1976); Giglio, 405 U.S. at 154; Brady, 373 U.S. at 87-88. With respect to this circuit's decisions, many of those advanced by Jean involved nondisclosure by prosecutors or are otherwise totally inapposite. E.g., Norris v. Slayton, 540 F.2d 1241, 1244 (4th Cir. 1976) (prosecutor's failure to disclose police officer's report held Brady violation); Clarke v. Montgomery Ward & Co., 298 F.2d 346, 348 (4th Cir. 1962) (private common law action for malicious prosecution brought under diversity jurisdiction). These cases simply lack the requisite factual similarity to the instant case. Police officers in 1982 could not have been expected to survey decisions involving prosecutors' failures to disclose evidence to the defense and conclude that, by analogy, they bore an independent constitutional duty to provide evidence to prosecutors. Thus, this line of authorities cannot demonstrate that Shingleton and Collins violated Jean's clearly established constitutional rights.

Jean asserts that this circuit's opinion in Barbee v. Warden, Md. Penitentiary, 331 F.2d 842 (4th Cir. 1964), imposed a constitutional duty on police officers to give evidence to a prosecutor. In Barbee, the prosecutor failed to disclose certain police reports to the defense. Id. at 844. These reports contained the results of ballistics and fingerprint tests that cast doubt on Barbee's involvement in a shooting. Id. Although the prosecutor was unaware of the reports, this court held that his ignorance did not excuse his failure to disclose them to the defense and reversed a district court order denying Barbee postconviction relief. Id. at 846.

We believe that Jean misapprehends the essential holding of Barbee. Barbee did not require police, as a constitutional matter, to furnish evidence to a prosecutor. Instead, as this circuit later explained, Barbee held simply that the police's knowledge of such evidence would be imputed to the prosecutor in deciding whether the prosecutor had fulfilled his Brady duties. United States v. Sutton, 542 F.2d 1239, 1241 n.2 (4th Cir. 1976); see also Boone v. Paderick, 541 F.2d 447, 450-51 (4th Cir. 1976). By imputing the police's knowledge

14

of exculpatory evidence to the prosecutor, Sutton and Barbee simply encouraged prosecutors' offices to establish "procedures and regulations . . . to insure communication of all relevant information on each case." Giglio, 405 U.S. at 154. Thus, while prosecutors are not relieved of their Brady duties for failing to disclose material evidence known only to the police, police officers who in 1982 failed to give such evidence to prosecutors did not themselves violate a clearly established constitutional right.[2]

In sum, police officers in 1982 could reasonably have expected to be internally accountable to prosecutors for not turning over evidence in their possession. A failure to turn over exculpatory evidence might jeopardize a conviction under Brady. A failure to turn over inculpatory evidence might undermine the State's case. But the officers had no earthly idea that they would be subject to a federal cause of action for money damages when no relevant decision had held that the police's responsibility to furnish evidence to the prosecution was governed by federal constitutional law.[3]

_____

[2] In their dissenting opinions, Judge Ervin and Judge Hamilton dispute our reading of Barbee. Our reading, however, is supported both by the Supreme Court's decision in Giglio, 405 U.S. at 154, and this circuit's decisions in Sutton, 542 F.2d at 1241 n.2, and Boone, 541 F.2d at 450-51. Each of these decisions predates the relevant conduct of Collins and Shingleton. In contrast, the dissents' view of Barbee rests on implications from caselaw that postdates the relevant conduct in this case.

[3] More recently this circuit has recognized that the failure of police officers to turn over evidence to a prosecutor may violate a criminal defendant's constitutional right to receive such evidence. See Taylor v. Waters, 81 F.3d 429, 436 n.5 (4th Cir. 1996); Carter, 34 F.3d at 264; Goodwin v. Metts, 885 F.2d 157, 162-63 (4th Cir. 1989), overruled in part by Albright v. Oliver, 510 U.S. 266 (1994). Contrary to Judge Hamilton's claim that the majority fails to explain what it means by proper notice, the decisions in Taylor, Carter , and Goodwin now provide notice to police officers that they can be subject to monetary damages under section 1983 for failure to disclose exculpatory evidence to the prosecutor. These decisions, however, all postdate the events in this case and thus we do not adopt the dissent's theory that proper notice to defendants can be notice after the fact.

15

In this case, it is undisputed that the prosecutor, Assistant District Attorney Walter Vatcher, knew that the witnesses had been hypnotized and knew the details of the various identification procedures employed by the police during their investigation. Furthermore, Collins and Shingleton maintain that they also discussed with Vatcher the existence of the reports and recordings of the hypnoses, a claim Vatcher denies. Fifteen years after trial, the parties are still disputing the value of the hypnosis-related evidence, whether Vatcher was derelict in failing to ask for further details of it, and whether Shingleton and Collins were derelict in not providing it. In fact, however, the Supreme Court in Giglio had charged the prosecution with the duty to request and evaluate relevant evidence in the State's possession. Giglio, 405 U.S. at 154. Vatcher never contends in his affidavits that he asked for any materials related to the hypnoses, as might be expected of a prosecutor's office after Giglio . Furthermore, Vatcher admitted that "[o]fficers Shingleton and Collins turned over all evidence that I requested from them." His apparent decision not to request additional details of the hypnoses cannot now be recast as a constitutional failure by the police officers to disclose such evidence.

Even if there were some general constitutional obligation in 1982 to hand over evidence to a prosecutor, the precise nature of that duty was anything but clear. Nothing in the applicable caselaw suggested that the failure to turn over evidence relating to witnesses' hypnoses violated clearly established constitutional rights. As of 1982, no decision of either the Supreme Court or this circuit had held that police committed a constitutional violation by not handing over evidence of this sort. Of course, we do not require a case with facts identical to the instant one. Anderson, 483 U.S. at 640. But here no relevant case remotely resembled the situation confronted by Shingleton and Collins. Under these circumstances, we cannot hold them liable for a constitutional infraction.

Jean finally relies on several cases from other circuits, but such cases ordinarily do not demonstrate that a constitutional right was clearly established in this circuit. Most of these decisions do not even pertain to a police officer's failure to hand over evidence of witnesses' hypnoses to a prosecutor. Two cases did involve the disclosure of hypnosis-related evidence. One comes from the Second Circuit. United States v. Miller, 411 F.2d 825 (2d Cir. 1969). That

decision does not even speak to the constitutional strictures on police conduct. Miller involved only a prosecutor's failure to disclose evidence of a hypnosis to the defense. Id. at 832. Thus, it cannot demonstrate that Shingleton and Collins violated Jean's clearly established constitutional rights.

The other case comes from the Northern District of Georgia. Emmett v. Ricketts, 397 F. Supp. 1025 (N.D. Ga. 1975). Like Miller, Emmett is not binding authority in this circuit. Further, district court decisions such as Emmett cannot clearly establish a constitutional right because "while they bind the parties by virtue of the doctrine of res judicata, they are not authoritative as precedent and therefore do not establish the duties of nonparties." Anderson v. Romero, 72 F.3d 518, 525 (7th Cir. 1995); see also D'Aguanno v. Gallagher, 50 F.3d 877, 880 n.5 (11th Cir. 1995). In addition to lacking precedential force, district court opinions from other jurisdictions function as especially poor sources of law to demonstrate that a right was clearly established. Police officers in Jacksonville, North Carolina can hardly be expected to keep abreast of legal developments in the Northern District of Georgia to determine the scope of their constitutional obligations.

C.

A word about the dissenting opinions. The three dissenting opinions together illustrate why the qualified immunity defense had to be adopted in the first place. The dissents would impose novel theories of civil liability on officers in the absence of notice -- precisely the danger against which the defense of qualified immunity was designed to guard. See Davis, 468 U.S. at 195. The dissents somehow seize on vague proscriptions of "unfair" police conduct as determinative guideposts by which Collins and Shingleton should have measured their conduct. See post at 19 (Murnaghan, J., dissenting) (explaining that police's duty is "to protect every one of us from injustice" and that the officers' actions "were manifestly unfair"). The dissents also introduce post-1982 caselaw as support for a rule of law that officers should have anticipated in 1982. See post at 24 (Ervin, J., dissenting) (citing 1989 case); post at 29 (Hamilton, J., dissenting) (citing 1989, 1992, and 1996 cases). Furthermore, the dissents point to decisions outside this circuit as beacons of light that should have been recog-

17

nized from afar by the North Carolina police officers in this case. See post at 20 (Murnaghan, J., dissenting) (citing decisions from the D.C. Circuit and the Northern District of Georgia).

In sum, the dissents would fail to provide even the rudiments of notice to those whose conduct they now rush to condemn. One even goes so far as to say that "[i]t is irrelevant whether the officers would have been on notice in 1982 that a panel of this court had held other officers liable for a Brady violation under§ 1983" because "the underlying constitutional or statutory right upon which the § 1983 action is premised" can provide the needed guidance. See post at 25 (Ervin, J., dissenting). Yet it is precisely the bare-boned vagueness of constitutional phraseology that cannot guide the qualified immunity analysis. Anderson in fact emphasized as much in rejecting "the right to due process of law" as a helpful guide. See 483 U.S. at 639 ("[I]f the test of `clearly established law' were to be applied at this level of generality, it would bear no relationship to the`objective legal reason-ableness' that is the touchstone of Harlow."). The hope for profes-sional police work lies in the guidance provided by clearly communicated rules, not in the unbounded approaches adopted by the various dissenting opinions.

This case involves an attempted end run around the absolute immu-nity protecting the prosecutor -- a prosecutor who knew not only of the hypnosis of witnesses but also of the various identification proce-dures the officers employed. Blocked from pursuing a civil damages remedy against a prosecutor who admitted receiving all the evidence he requested from the investigating police officers, Jean now tries to shift the blame to the officers themselves. Although this circuit now recognizes that police too may be subject to Brady duties, it had not yet recognized such duties in 1982. And it would be wrong to allow the thwarting fact of prosecutorial immunity to force this case into an altogether different mold -- one where the police officers are subject to constitutional duties that in fact materialized only after Jean's pros-ecution.

In conclusion, the relevant sources of law do not clearly establish that in 1982 police themselves labored under federal constitutional duties with respect to the disclosure of evidence to the prosecution or that such duties, if any, included a responsibility to disclose evidence

18

relating to witnesses' hypnoses. In holding that these officers are entitled to qualified immunity, we do not diminish the seriousness of Jean's incarceration. But this court already has granted his petition for a writ of habeas corpus. Jean v. Rice, 945 F.2d 82. To go further, however, and impose money damages against Shingleton and Collins would blindside these defendants and make them into scapegoats with the aid of many years of hindsight. It would also violate the cardinal principle of qualified immunity -- that officials may not later be subject to monetary liability when their behavior at the time did not violate any clearly established constitutional right.

IV.

For the foregoing reasons, we affirm the judgment of the district court.

AFFIRMED

MURNAGHAN, Circuit Judge, dissenting:

The substance of the point which I dissent to emphasize has been made more politely by Judge Ervin in his dissent. He has refrained, because he is more of a gentleman than I, from using some clear and simple words that judges should abide by. Judges should unflinchingly see that fairness prevails, particularly in the conduct of police. The overwhelming duty of officers sworn to enforce the law is to protect every one of us from injustice. The proper responsibility of the police is to identify, indict, convict and imprison actual criminals; the actions of Officers Shingleton and Collins, which led to the wrongful conviction and lengthy imprisonment of Lesly Jean, were manifestly unfair.

The majority opinion marks an unmistakable movement in this circuit to a rule of actually unqualified, though technically called qualified, immunity for police officers. The means by which this has been accomplished while paying lip service to qualified immunity principles are three-fold: emphasis upon the special exigencies of police work with its unique demands for spontaneous, unreflective action; a perceptible lowering of the objective reasonableness standard for

19

assessing police awareness and conduct in particular cases; and, closely related to the latter, a dramatic narrowing of that law which, for police officers, will be considered well-settled at the critical time. The last of these is the principal vehicle by which the majority finds qualified immunity here. Judge Ervin's dissent persuasively demonstrates the error in that analysis.

The majority holds today that "[o]rdinarily, . . . courts in this circuit need not look beyond the decisions of the Supreme Court, this court of appeals, and the highest court of the state in which the case arose to determine whether a right was clearly established at a particular time." Maj. op. at 13. I disagree that such an approach should inevitably be applied, and would consider pertinent authority from other jurisdictions in determining whether a constitutional right was clearly established at the time of the alleged violation. See, e.g., United States v. Bryant, 439 F.2d 642, 650 (D.C. Cir. 1971) (holding that "[t]he duty of disclosure affects not only the prosecutor, but the Government as a whole, including its investigative agencies"); Emmett v. Ricketts, 397 F. Supp. 1025, 1040-42 (N.D. Ga. 1975) (noting that Barbee v. Warden, 331 F.2d 842 (4th Cir. 1964), was "particularly apropos" in holding that a hypnotist hired by the prosecutor had a duty to disclose records of hypnosis). I emphasize, moreover, that a right may be clearly established even though no prior case exists involving the "very action" challenged as unlawful, see Anderson v. Creighton, 483 U.S. 635, 640 (1987), a rule we often repeat but only rarely apply.

Diligent and honest pursuit of lawbreakers by police officers is the rule, and we should require no less. That duty undoubtedly includes the obligation to furnish the prosecutor with exculpatory evidence, and that responsibility was clearly established in 1982. I dissent.

ERVIN, Circuit Judge, dissenting:

The majority holds that Lesly Jean had no clearly established constitutional right to the delivery of material, exculpatory evidence from Officers Collins and Shingleton ("the officers") to the prosecutor during his 1982 trial. For the reasons below, I find the majority's absolute immunity analysis unnecessary and its discussion of the qualified immunity question unpersuasive. Therefore, I respectfully dissent.

20

I.

The majority begins its analysis with an extended discussion of the officers' absolute immunity from § 1983 liability on a theory, purportedly advanced by Jean, that the officers were under a duty to deliver material, exculpatory evidence <u>directly</u> to Jean's defense counsel. The majority strains to point to evidence of this theory in the record because the argument is nowhere to be found in Jean's brief on appeal. In fact, Jean clearly argues that the constitutional violation at issue is the officers' failure to disclose evidence to the <u>prosecutor</u>, and not directly to defense counsel. In Jean's brief, the "Statement of Issue Presented for Review" identifies the constitutional right at issue as "a law enforcement officer's obligation to disclose exculpatory evidence <u>to prosecutors</u>." <u>Appellant's Br.</u> at 1 (emphasis added). In his "Summary of the Argument," Jean mentions four times, in one and one-half pages, that the officers were under an obligation to disclose evidence to the prosecutor. <u>See Appellant's Br.</u> at 23-24. So far as I can determine from the record, Jean has never actively pursued a theory of liability for the officers' failure to disclose evidence directly to defense counsel. For that reason, there has been no discussion of absolute immunity in any of the previous proceedings in this case.

This is significant because immunity is an affirmative defense that must be pled lest it be waived. <u>See Gomez v. Toledo</u>, 446 U.S. 635, 640 (1980); <u>Wilkes v. Young</u>, 28 F.3d 1362, 1377 n.12 (4th Cir. 1994) (Phillips, J., dissenting); <u>Buenrostro v. Collazo</u>, 973 F.2d 39, 44 (1st Cir. 1992). While the officers' answer to the complaint raises the defense of "qualified good faith immunity," <u>see J.A.</u> at 39, it says nothing of absolute immunity. On this very question, the Sixth Circuit has held that a defendant waives his right to absolute immunity if he raises only qualified immunity in his answer, motion to dismiss, or summary judgment motion. <u>See Collyer v. Darling</u>, 98 F.3d 211, 222 (6th Cir. 1996) ("Although [the defendant] did raise the affirmative defense of qualified immunity, an absolute immunity determination involves an entirely different analysis. Given that the defense of absolute immunity was not affirmatively pleaded or argued . . . and in light of the significant distinctions between qualified and absolute immunity claims, this defense was affirmatively waived .. . ."), <u>cert. denied</u>, 117 S. Ct. 2439 (1997).

If, as the majority believes, "Collins and Shingleton clearly understood Jean's complaint to allege their failure to disclose evidence directly to Jean's defense counsel," maj. op. at 6, then the officers were obliged to raise absolute immunity as an affirmative defense in their answer to that complaint or, at the very least, in their memorandum in support of their motion for summary judgment. While I do not believe that Jean has proceeded on a theory that police officers must disclose evidence directly to defense counsel, if the majority is correct that he has, then the officers have waived any claim of absolute immunity that may have been available.

I also would note that the majority's discourse on absolute immunity does nothing to call into question our cases in which police officers have been held liable for money damages for failure to turn over material, exculpatory evidence to the prosecutor. See Taylor v. Waters, 81 F.3d 429, 436 n.5 (4th Cir. 1996); Carter v. Burch, 34 F.3d 257, 263-64 (4th Cir. 1994). The majority's discussion of absolute immunity merely clarifies that, as a matter of theory, a police officer may be liable for a Brady violation under § 1983, not because he is under a duty to disclose evidence directly to defense counsel, but rather, because his duty is to deliver such information to the prosecutor.

II.

Having toppled its straw man, the majority proceeds to answer the real question raised by this case -- whether the officers are entitled to qualified immunity on Jean's theory that they were under a duty to deliver material, exculpatory evidence to the prosecutor. In section III of its opinion, the majority holds that the officers are entitled to qualified immunity because it was not clearly established in 1982 that the officers violated the law in failing to hand over material, exculpatory evidence to the prosecutor. For the reasons I expressed in my opinion for the panel in this case, see Jean v. Collins, 107 F.3d 1111 (4th Cir. 1997), vacated, (Sep. 19, 1997), and for those articulated by Judge Hamilton in his concurring opinion, see Jean, 107 F.3d 1118-20, I disagree with the judgment of the majority of the court. Aside from those general arguments, however, I wish to point out my specific disagreements with the reasoning in the majority opinion.

22

In order to do this, it is helpful to recognize exactly what requests for evidence were made by defense counsel in this case. Defense counsel in fact made two requests for evidence. The first was a generalized motion for discovery that included the following requests: 1) "[t]o disclose the facts and circumstances surrounding any . . . pretrial identification;" and 2) "[t]o permit the defendant to inspect and copy . . . mechanical or electronic recordings, tangible objects, or copies or portions thereof." Jean v. Rice, 945 F.2d 82, 85 (4th Cir. 1991).

The second request for evidence came after trial had already begun, when defense counsel learned for the first time, during the State's direct examination of the victim, that both she and Officer Shingleton had been hypnotized by Collins. At that point, defense counsel renewed their motion for discovery and asked the prosecution for any tapes or notes that were made during the hypnoses. The panel that granted Jean's habeas petition recognized this second request, see Jean, 945 F.2d at 85 ("After learning of the hypnosis, counsel requested any recordings that might exist -- inexplicably the state still did not provide its records or tapes."), as does the majority in this case, see maj. op. at 5 ("The prosecutor also did not disclose the recordings of the hypnotic sessions, despite general pretrial discovery requests and a more specific request for such recordings by defense attorneys at trial."). Defense counsel not only made a "more" specific request for evidence, they could not have been any more specific: defense counsel requested an audiotape or notes from the hypnoses, if any such tape or notes existed. We know now that the officers created an audiotape and took notes during the hypnoses, that this evidence was in the officers' possession, and yet it was not given to the prosecutor.

I point this out to indicate how the majority's discussion in page 16 of its opinion is not dispositive of the question on appeal. As to the first, generalized request for discovery, the majority argues that because of the nature of the evidence in question (hypnosis evidence), the officers may or may not have known that such evidence would fall under the rubric of material, exculpatory evidence. But as to defense counsel's second request, specifically asking for any existing tapes or notes of the hypnoses, the nature of the evidence drops out of consideration.

23

Surely the majority would agree that, as a general matter, Jean had a clearly established right in 1982 to material, exculpatory evidence that had been specifically identified and requested by his defense counsel. In light of defense counsel's specific request for tapes or notes from the hypnoses, the nature of the evidence is irrelevant to the Brady question. Defense counsel requested any audiotape or notes that might exist regarding hypnosis; those tapes and notes existed, the officers knew they existed and were within their control, and yet the officers did not turn them over to the prosecutor.

Stripped of its surplusage, then, the majority's holding in this case rests on its argument that in 1982 a reasonable police officer would not have known that in concealing evidence from the prosecutor he violated the constitutional rights of a criminal defendant. The majority concedes that recent precedent in this circuit recognizes that such police misconduct can be a violation of a defendant's constitutional rights. See maj. op. at 15 n.3 (citing Goodwin v. Metts, 885 F.2d 157, 162-63 (4th Cir. 1989), overruled in part by Albright v. Oliver, 510 U.S. 266 (1994)). The majority's argument is simply that while this right is now clearly established, it was not in 1982. Although the majority cites and recognizes this court's decision in Goodwin v. Metts, the majority fails to appreciate its significance.

In Goodwin, the court confronted the identical question posed in this case: whether a police officer should receive qualified immunity in a § 1983 action for failing to disclose exculpatory information in his possession to the prosecutor. The importance of Goodwin is that the conduct at issue in that case occurred in 1983, the year after the events at issue in this case. Goodwin held that a police officer was not entitled to qualified immunity for failure to turn over exculpatory evidence to a prosecutor because such conduct violated a constitutional right that was clearly established in 1983: "A reasonable officer would have known that a prosecution carried out without . . . disclosure of exculpatory information would violate the constitutional rights of the criminal defendants." Goodwin, 885 F.2d at 164. Since the majority does not call Goodwin into question, I assume the majority would agree that had the events at issue in this case taken place in 1983, the illegality of the officers' conduct would have been clearly established.

24

The majority's analysis of this issue reveals a misunderstanding about my use of Goodwin, see maj. op. at 17, as well as the nature of qualified immunity. A right does not become clearly established when a plaintiff successfully brings an action to enforce it under § 1983, as the majority apparently believes. See maj. op. at 15 ("[T]he officers had no earthly idea that they would be subject to a federal cause of action for money damages . . . ."); maj. op. at 15 n.3 ("Goodwin now provide[s] notice to police officers that they can be subject to monetary damages under section 1983 . . . ."). It is irrelevant whether the officers would have been on notice in 1982 that a panel of this court had held other officers liable for a Brady violation under § 1983. The question is whether the underlying constitutional or statutory right upon which the § 1983 action is premised was clearly established at the time the officers acted. Goodwin is clear in its holding that the constitutional right at issue in this case was clearly established in 1983, one year after the officers' conduct here.

In order to go along with the majority's position, then, one must assume that a case was decided between 1982 and 1983 which clearly established that police officers violate the constitutional rights of a criminal defendant when they conceal material, exculpatory evidence from the prosecutor. This is the only way to reconcile the majority's opinion, holding that "police officers who in 1982 failed to give [exculpatory] evidence to prosecutors did not themselves violate a clearly established constitutional right," see maj. op. at 15, and Goodwin, holding that police officers who failed to perform the same duty in 1983 did violate a clearly established right. Of course, no such case exists. A criminal defendant's constitutional right to have the police turn over material, exculpatory evidence to the prosecutor has been clearly established in this circuit since at least 1964.

> [I]t makes no difference if the withholding[of exculpatory evidence] is by officials other than the prosecutor. The police are also part of the prosecution, and the taint on the trial is no less if they, rather than the State's Attorney, were guilty of the nondisclosure. If the police allow the State's Attorney to produce evidence pointing to guilt without informing him of other evidence in their possession which contradicts this inference, state officers are practicing decep-

25

> tion not only on the State's Attorney but on the court <u>and the defendant</u>.

<u>Barbee v. Warden, Md. Penitentiary</u>, 331 F.2d 842, 846 (4th Cir. 1964) (emphasis added) (footnote omitted).

The majority believes that, in 1982, the law of this circuit held that if a police officer withheld exculpatory evidence from a criminal defendant, this misconduct was not a direct constitutional violation, but rather, was "imputed to" the prosecutor. The majority's "imputed to" theory is an elaborate legal fiction that emanates from a footnote in our decision in <u>United States v. Sutton</u>, 542 F.2d 1239, 1241 n.2 (4th Cir. 1976). The majority creates this "imputed to" legal fiction based on a single footnote in <u>Sutton</u>, ignoring this court's clear holdings in <u>Barbee</u> and its progeny. The majority ignores <u>Barbee</u>'s plain statement that the police misconduct at issue in this case practices a deception "not only" on the prosecutor, but on the court "and the defendant." <u>See Barbee</u>, 331 F.2d at 846. The most logical and consistent interpretation of this court's precedent suggests that Jean's right to material, exculpatory evidence has been clearly established since our decision in <u>Barbee</u>.

More importantly, if a police officer's misconduct was "imputed to" the prosecutor in 1982, the majority fails to explain at what point since 1982 we rejected the "imputed to" analysis. The majority recognizes that our circuit has recently upheld § 1983 judgments against police officers who withheld material, exculpatory evidence from a criminal defendant. <u>See maj. op.</u> at 15 n.3. This means that a police officer's withholding of exculpatory evidence is no longer "imputed to" the prosecution for purposes of holding an officer liable under § 1983. The majority points to no authority to explain how this kind of police misconduct was "imputed to" the prosecutor in 1982, but is now its own direct violation of a criminal defendant's constitutional rights.

The simple answer here is that no authority exists to explain this change because the change never occurred in the first place. At least since <u>Barbee</u> in 1964, a reasonable police officer in North Carolina would have known that a criminal defendant has a clearly established right to have officers deliver material, exculpatory evidence to prose-

26

cutors. For that reason, the officers in this case are not entitled to qualified immunity for their misconduct.

III.

According to the majority, holding Collins and Shingleton liable for the violation of Jean's constitutional rights would make them scapegoats. Nothing could be further from the truth-- the real scapegoat in this matter is Lesly Jean. Jean spent nine years in prison for a crime he did not commit because police officers used "hypnosis" to alter the description of the perpetrator of this crime so that it matched Jean's appearance and his clothes.

The officers in this case are not scapegoats. To the contrary, they are without doubt responsible for the mockery of justice that resulted in Jean's nine-year confinement. As I have argued, the question before us is whether a reasonable police officer would have known in 1982 that concealing evidence from the prosecutor violated the constitutional rights of a criminal defendant. While qualified immunity should be invoked in every case in which an officer's conduct was arguably within the bounds of the law, in this case no such argument can be made. The officers' conduct in the prosecution of Jean was reprehensible and a total betrayal of the trust that society places in those whom it empowers to enforce the law. That Jean will not be allowed the opportunity to present his claim to a jury only perpetuates the injustices that have befallen him in the legal process, and I respectfully dissent. Judges Murnaghan, Hamilton, Michael, and Motz join in this dissent.

HAMILTON, Circuit Judge, dissenting:

The major theme of the majority's opinion is "No Case on Point!" That is, the majority leaves no doubt that, to avoid the qualified immunity gauntlet, a § 1983 plaintiff must demonstrate that in a prior case decided by the Supreme Court, this court, or the highest court of the state in which the case arose, the conduct engaged in by the government official was held to be constitutionally unlawful. The "No Case on Point" doctrine makes a mockery of the Supreme Court's decision in Anderson v. Creighton, 483 U.S. 635 (1987). In Anderson, the Supreme Court explicitly held that a § 1983 plaintiff need not

27

show that in a prior case the government official's actions were held to be constitutionally unlawful. Id. at 640. Because the majority fails to follow Anderson, I dissent.

Qualified immunity turns on whether, at the time of the government official's conduct, the actions of the government official violated "clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982). The "contours of the right must be sufficiently clear that a reasonable official would understand what he is doing violates that right." Anderson, 483 U.S. at 640. In other words, the government official's action in question need not have previously been found to be unlawful, see id.; rather, "in light of pre-existing law the unlawfulness must be apparent," id.

At the time of Shingleton and Collins' actions in 1982, our case law clearly established that a defendant's due process rights were violated when the police concealed material exculpatory evidence. See Barbee v. Warden, 331 F.2d 842, 846 (4th Cir. 1964); see also Boone v. Paderick, 541 F.2d 447, 450-51 (4th Cir. 1976) (holding that duty to disclose not "neutralized because [evidence] was in the hands of the police rather than the prosecutor"). As we noted in Barbee:

> Failure of the police to reveal such material evidence in their possession is equally harmful to a defendant whether the information is purposefully, or negligently, withheld. And it makes no difference if the withholding is by officials other than the prosecutor. The police are also part of the prosecution, and the taint on the trial is no less if they, rather than the State's Attorney, were guilty of the nondisclosure. If the police allow the State's Attorney to produce evidence pointing to guilt without ever informing him of other evidence in their possession which contradicts this inference, state officers are practicing deception not only on the State's Attorney but on the court and the defendant. . . .

331 F.2d at 846 (footnote omitted).

In holding that Shingleton and Collins are entitled to qualified immunity, the majority first posits that a reasonable officer in 1982

28

would not have known that withholding material exculpatory evidence violated Jean's constitutional rights. This proposition is tomfoolery. Barbee established the proposition that a criminal defendant has the constitutional right to have the police disclose material exculpatory evidence. Id. In cases post-Barbee, we have consistently held that a police officer can be liable under § 1983 for the failure to disclose material exculpatory evidence. See Taylor v. Waters, 81 F.3d 429, 436 n.5 (4th Cir. 1996); Carter v. Bunch , 34 F.3d 257, 264 (4th Cir. 1992); Goodwin v. Metts, 885 F.2d 157, 162-63 (4th Cir. 1989), overruled in part by Albright v. Oliver, 510 U.S. 266 (1994). Because there have been no cases since Barbee altering the longstanding principal that a police officer has the duty to disclose material exculpatory evidence, Shingleton and Collins are not entitled to qualified immunity.

The majority does explain in a footnote what it would take to make the unlawfulness of Shingleton and Collins' actions"apparent." The majority posits that our decisions in "Taylor , Carter, and Goodwin now provide notice to police officers that they can be subject to monetary damages under section 1983 for failure to disclose exculpatory evidence to the prosecutor." Ante at 15 n.3. Thus, according to the majority, a case on point is required to provide the necessary notice to police officers before they can be liable under§ 1983. This is precisely what Anderson says is forbidden. See 483 U.S. at 640.

Perhaps an even more fundamental problem with the majority's analysis is its failure to explain why the unlawfulness of the conduct of the officers was apparent to the officers in Goodwin (where the officers' actions occurred in 1983), but was not apparent to Shingleton and Collins in 1982. Judge Ervin correctly points out that there was no intervening decision between 1982 and 1983 that would have made the officers in Goodwin more aware of their unlawfulness than Shingleton and Collins. See ante at 23-25. Thus, in the absence of an intervening decision, there is no rational way to square the reasoning of Goodwin--that a police officer is not entitled to qualified immunity for his failure to disclose material exculpatory evidence, if his actions occurred in 1983--with the reasoning of the majority--that a police officer is not entitled to qualified immunity for his failure to disclose material exculpatory evidence, if his actions occurred in 1982. This point is important because it illustrates the dramatic shift

29

in our qualified immunity jurisprudence. Whereas a case on point was not required when Goodwin was decided, now one is. And such "case on point" decisionmaking is patently at odds with Anderson.

In a last ditch effort to find qualified immunity, the majority also posits that a reasonable officer would not have known that withholding exculpatory evidence in the form of statements given under hypnosis violated Jean's constitutional rights. This rationale is even more absurd than the first one served up by the majority. Suffice it to say that exculpatory evidence is exculpatory evidence. The nature of the exculpatory evidence is simply irrelevant. To hold otherwise would turn Brady v. Maryland, 373 U.S. 83 (1963), on its head.

It follows that I would reverse.

Judge Murnaghan joins in this dissent.

30